T.C. Memo. 1999-134

UNITED STATES TAX COURT

GAC PRODUCE CO., INC., AN ARIZONA CORPORATION, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 26700-95, 9347-96.     Filed April 21, 1999.

<u>J. Michael Traher</u>, for petitioner.

<u>Marikay Lee-Martinez</u>, <u>Rachael J. Zepeda</u>, and <u>J. Robert
Cuatto</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARR, <u>Judge</u>:  Respondent determined deficiencies in, and
additions to or penalties on, petitioner's Federal income taxes
as follows:

| | | Additions to Tax or Penalties | | | | | | |
| | | Sec. | Sec. | Sec. | Sec. | Sec. | Sec. | Sec. |
| FYE | Deficiency | 6651(a)(1) | 6651(a)(2) | 6653(a)(1) | 6661(a) | 6662(a) | 6662(d) | 6662(e) |
| 6/30/89 | $1,200,812 | $300,203 | -- | $60,041 | $300,203 | -- | -- | -- |
| 6/30/90 | 1,976,911 | 494,228 | -- | -- | -- | -- | $268,434 | $253,897 |
| 6/30/91 | 1,741,876 | 435,469 | -- | -- | -- | -- | 206,786 | 283,178 |
| 6/30/92 | 741,723 | 33,730 | $3,748 | -- | -- | $149,911 | -- | -- |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions,[1] the issue for decision is whether the commission fees petitioner received from certain related entities constituted arm's-length charges for the services rendered. We hold that petitioner did not receive an arm's-length commission rate and that the commission rate should be adjusted as stated herein.

                          FINDINGS OF FACT

Some facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference. When it filed its petitions, petitioner had its principal office in Nogales, Arizona.

Petitioner, an Arizona corporation, is in the business of distributing and marketing in the United States fresh produce grown mostly in Mexico. Petitioner files its Federal corporate

---

[1]See appendix.

income tax returns on an accrual basis, using a tax year ending June 30.[2]

During the years in issue, Alejandro Canelos Rodriguez (Mr. Canelos) owned 57 percent of petitioner's common stock. His cousin, Basilio Georgacopulos Kanelopulos (Mr. Kanelopulos), owned 40.5 percent of the common stock, and Mr. Canelos' sister, Juana Canelos de Castro, owned the remaining 2.5 percent. During those years, Mr. Canelos served as petitioner's president and chairman of the board of directors, and Mr. Kanelopulos served as its treasurer.

During the years in issue, petitioner had warehouse operations in both Arizona and California. Petitioner handled produce year-round and was considered to be a major distributor of fresh produce, in a normal year averaging 17 percent of the entire U.S. fresh market tomato imports. Petitioner held a license issued by the U.S. Department of Agriculture (DOA) pursuant to the Perishable Agricultural Commodities Act (PACA), ch. 436, secs. 3 and 4, 46 Stat. 531, 533, which permitted it to sell and distribute produce in the United States. Petitioner's main source of income came from providing produce distribution services, and most of its costs were associated with providing

---

[2]Petitioner used a fiscal year ending Sept. 30 until Sept. 30, 1987. After that date, petitioner changed its accounting period to a fiscal year ending June 30 for both book and income tax purposes.

those services.  Petitioner's major expenses were fixed costs, although it had some capital investments in warehouses and equipment.

For years ending 1980 through 1994, petitioner reported the following taxable income, before net operating loss deductions or carryovers:

| FYE | Income |
|------|------------|
| 1980 | $52,621 |
| 1981 | 13,169 |
| 1982 | 186,148 |
| 1983 | 228,346 |
| 1984 | 204,601 |
| 1985 | 86,863 |
| 1986 | (680,868) |
| 1987 | (908,015) |
| 1988 | (116,678) |
| 1989 | (740,114) |
| 1990 | (308,478) |
| 1991 | (1,538,326) |
| 1992 | (1,565,929) |
| 1993 | (213,587) |
| 1994 | 411,827 |

During the years in issue, petitioner primarily sold tomatoes, but it also marketed other produce, including cucumbers, bell peppers, melons, and grapes.  During those years, petitioner distributed produce for Mexican growers (Canelos growers) that were related to and controlled by Mr. Canelos.  For the years in issue, the Canelos growers operated under various names, including Canelos Hermanos, Frutas y Vegetales Del Valle (Frutave), Administradora Horticola Del Tamazula (Adhota), and

Productora ABC (Productora).[3]  The parties stipulated that Mr. Canelos controlled petitioner and the Canelos growers within the meaning of section 1.482-1(a)(3) through (5), Income Tax Regs. The Canelos growers have been distributing produce in Mexico for almost as long as they have been distributing produce in the United States, and the Canelos growers have established relationships with Mexican buyers.  They operated out of Mr. Canelos' main office in Culiacan, Sinaloa, Mexico.  Hereinafter, we will refer to petitioner and the Canelos growers collectively as the Canelos group; to Mr. Canelos and his brother Constantino Canelos Rodriguez (Constantino) collectively as the Canelos brothers; to the Canelos brothers and members of their families collectively as the Canelos family; and to the Canelos family and their related businesses collectively as the Canelos organization.  The Canelos organization functioned as a vertically integrated operation with farming, packing, and trucking operations in Mexico and sales and distribution operations in the United States.

For the years in issue, the Canelos growers' produce sales accounted for 98.76 percent, 99.28 percent, 89.24 percent, and 95.87 percent, respectively, of petitioner's total sales.

---

[3]Although the entities under which the Canelos growers operated changed names during the years in issue, the majority of the members remained the same.

Petitioner had the following sales and volume activity relating to the Canelos growers for the years in issue:

| FYE | Sales | Boxes |
|-----|-------|-------|
| 1989 | $43,037,000 | 6,209,000 |
| 1990 | 63,445,000 | 6,188,000 |
| 1991 | 29,013,000 | 3,915,000 |
| 1992 | 22,755,000 | 2,099,000 |

Petitioner's main selling season ran from November through mid-May. It worked solely on commission, and, except for produce sold through Robling & Cathey, L.A., Inc. (RCLA),[4] a company owned by the Canelos brothers, petitioner did not take title to the produce it distributed.

In addition to the Canelos growers' produce, petitioner distributed produce for independent Mexican growers (otros growers) not related to or controlled by the Canelos family. The otros growers generally were small growers who produced a different line of produce (e.g., grapes, European cucumbers, squash, melons) from the main lines of produce handled by the Canelos group. None of the otros growers shipped tomatoes.

---

[4]RCLA Division functioned as a separate division of petitioner until petitioner sold the division's assets to RCLA effective June 30, 1990. RCLA was owned by International Farm Equipment Distributors, Inc., a Liberian corporation owned equally by Mr. Canelos and Constantino. Produce sold through RCLA is not in issue in the instant cases.

During the years in issue, services generally performed by petitioner on behalf of the growers it represented, both related and unrelated, included:

(a) Hiring Mexican customs brokers to arrange for border inspections and clearing activities by Mexican customs, the DOA, and Mexican trade associations;

(b) hiring U.S. customs brokers to arrange for inspection and clearing activities on the U.S. side of the border;

(c) paying border-crossing fees and charges, which then were charged directly to the growers' accounts;

(d) for 1989, 1990, and 1991, paying Mexican labor expenses for loading and unloading produce to be inspected on the Mexican side of the border, which were not charged to the growers;

(e) paying Mexican legal expenses incurred with respect to border crossings, which were not charged to the growers;

(f) storing the growers' produce at petitioner's distribution warehouses in Nogales, Arizona, and/or San Diego, California;

(g) paying laborers for unloading the produce at the warehouses;

(h) inspecting the produce at the warehouses for damage, perishability, and disease;

(i) paying any expenses incurred in repacking the produce if the pallets or cartons were torn, broken, or crushed when the produce arrived;

(j) destroying or returning to the grower any produce that petitioner found unsatisfactory;

(k) employing salespeople who negotiated the sales terms, including the price to be paid for the produce;

(l) invoicing the sales;

(m) arranging with the purchaser shipping schedules of the produce from petitioner's warehouses;

(n) loading sold produce onto the trucks of the purchaser;

(o) collecting from the purchaser the proceeds from the produce sales and crediting the growers' accounts when the produce was sold;

(p) performing all duties associated with collecting the proceeds from the sales of produce, including filing PACA claims with respect to uncollected accounts;

(q) liquidating the growers' accounts;[5]

(r) making final liquidations by disbursing funds from a grower's liquidation account at the end of the growing

---

[5]A grower liquidation is the payment to the grower of the difference between the sales price and the charges and costs for selling the grower's produce.

season or after 30 to 40 days from the date of the last sale;

(s) debiting accounts receivable and crediting sales for the full amount of the sale upon a sale of a grower's produce to a purchaser (a sale could include produce from both related and unrelated growers);

(t) conducting promotional activities, such as designing print advertisements and participating in industry trade shows; and

(u) performing at the grower's expense promotional activities involving labels not owned by either petitioner or related growers.

In liquidating an account, petitioner subtracted from the sales proceeds its commission and all expenses and costs due from the grower. Petitioner then disbursed the remaining funds to the grower and gave the grower a "liquidation sheet" (final settlement statement).

Additionally, petitioner performed the following services solely for the Canelos family or for the Canelos growers:

(a) Making sales proceeds available for offset to the Canelos growers' loan accounts or for disbursement to them as soon as the sales were made;

(b) performing personal administrative duties, such as paying bills, for Canelos family members;

(c) performing administrative duties for other entities owned or controlled by Canelos family members;

(d) in 1989 and 1990, paying an employee of the Canelos brothers or their related entities to coordinate growers, not the otros growers, in the Baja California, Mexico, region (Baja) and to find additional land owners whose produce could be shipped through the Canelos organization's packing plant in the Baja.

Alberto Maldonado Guerra (Mr. Maldonado) served as petitioner's general manager during the years in issue. He reported directly to Mr. Canelos. Mr. Maldonado oversaw petitioner's day-to-day operations. He monitored petitioner's financial status through daily sales reports, weekly receivables and payables data, and trial balances. In addition to his position as petitioner's general manager, Mr. Maldonado served as secretary-treasurer of Apollo Produce Distributors (Apollo), which also was owned by the Canelos brothers.

Petitioner's head bookkeeper and office manager, Eva Padilla (Mrs. Padilla), reported directly to Mr. Maldonado. Mrs. Padilla also served as vice president and secretary and a member of the board of directors of RCLA. In addition, she owned Apache Produce Distributors, Inc. (Apache), with her husband, Peter Padilla (Mr. Padilla). Mr. Padilla served as president of Apache.

Petitioner had approximately 10 people in its accounting section. It contracted with RCLA to perform the sales function.

Relationship With Dole

In November 1981, the Canelos group began doing business with Dole Food Co. (Dole),[6] Dole, a publicly held company, or some of its subsidiaries or affiliated companies. Hereinafter, Dole and its subsidiaries or affiliated companies collectively will be referred to as Dole. The business relationship between the Canelos group and Dole constituted a joint venture.

The first agreement between Dole and the Canelos group was a 1-year contract (1981 contract), entitled "Sales Subagency Agreement", in which petitioner and Standard Fruit and Steamship Co. (Standard Fruit), a company affiliated with Dole, were the designated parties. In the 1981 contract, Standard Fruit agreed to use its marketing resources to market more effectively in the United States and Canada tomatoes, cucumbers, and bell peppers grown by the Canelos growers in the Culiacan district of Mexico. Standard Fruit would receive a commission of 25 percent of total profit of each product, computed after subtracting from total revenue (from sales of the product by Standard Fruit, petitioner,

---

[6]Some documents in the record refer to Castle & Cooke, Inc., rather than to Dole. Although the exact business relationship is not explained in the record, it appears that Dole Food Co. was a division of Castle & Cooke, Inc., for at least some portion of the years in issue. For simplicity, we will use the name Dole throughout.

or the Canelos growers) selling costs, freight costs, product costs, and any Mexican-imputed business taxes assessed on sales of the product. Included in selling costs was a commission of 40 cents per box paid to petitioner. Standard Fruit further agreed to share in 25 percent of the losses and to advance the working capital needs of the venture up to $2.5 million.

In July 1982, petitioner and Produce America, Inc. (Produce America), a subsidiary of Dole, entered into a 5-year agreement (1982 contract) entitled "Sales Subagency Agreement". In the 1982 contract, Produce America agreed to use its marketing resources to market more effectively in the United States, Canada, and Europe tomatoes, cucumbers, bell peppers, squash, and eggplant grown by the Canelos growers in various areas in Mexico. It received a commission of 50 percent of the total profit of each product. Profit was computed after subtracting from total sales revenue selling costs, freight costs, product costs, duties, and any Mexican-imputed business taxes assessed on sales of the product. Included in selling costs was a commission of 40 cents per box paid to petitioner. Produce America further agreed to share in 50 percent of the losses and to advance the working capital needs of the venture up to an amount mutually agreed upon by the parties.

The SCP Contract

As of June 16, 1985, petitioner and Sun Country Produce, Inc. (SCP), a wholly owned subsidiary of Dole, entered into a 5-year agreement (SCP contract) entitled "Sales Subagency Agreement".  The SCP contract superseded the 1982 contract and, as amended, was in effect during the years in issue. Hereinafter, we will sometimes refer to the overall business relationship between the Canelos group and Dole under the SCP contract as the SCP deal.

Under the SCP contract, SCP agreed to use its marketing resources to market more effectively in the United States, Canada, and certain countries in Europe tomatoes, cucumbers, bell peppers, squash, eggplant, and any other fresh produce specified by the parties that was grown by the Canelos growers in various areas in Mexico.  SCP received a commission generally of 45 percent[7] of the total profit on each product.  Profit was

---

[7]Sec. 2.01 of the Sales Subagency Agreement dated as of June 16, 1985, provides in pertinent part:

    2.01  Commission

        At the beginning of each growing season, G.A.C. and S.C.P. shall mutually agree upon an annual profit target for all Products in the Territories. Each year during the term of the Agreement, S.C.P. shall, as compensation for its services, be paid a commission, for any annual period in which the actual profit equals or is less than the annual profit target, of forty-five percent (45%) of the final season-end

(continued...)

computed after subtracting from total sales revenue selling

costs, freight costs, product costs, import duties, any Mexican

imputed business taxes assessed on sales of the product, and any

exchange rate losses due to either devaluation of the peso or the

currency repatriation requirements of the Mexican Government.

Included in selling costs was a commission of 40 cents per box

paid to petitioner.  The Canelos growers received the remaining

55-percent share of the profits.  SCP further agreed to share in

50 percent of the losses and to advance funds for the working

capital needs of the venture up to an amount mutually agreed upon

by the parties.  Petitioner executed promissory notes with SCP in

which petitioner promised to repay the advances, and Mr. Canelos

---

[7](...continued)
profit calculation made with respect to the growing and
marketing of the products during the annual period as
specified in Section 2.02.  For any annual period in
which the actual annual profit exceeds the annual
profit target, the following commission shall be paid
to S.C.P.:

| AMOUNT OVER ANNUAL PROFIT TARGET | S.C.P. COMMISSION PERCENTAGE ON AMOUNT OVER PROFIT TARGET |
|---|---|
| Up to $2,000,000 | 40% |
| $2,000,001 to $4,000,000 | 35% |
| $4,000,001 and Over | 30% |

Should G.A.C. and S.C.P. be unable to reach
agreement, as to the annual profit target for any
annual period during the term of this Agreement, the
parties hereby agree that the annual profit target for
such annual period shall be the lower of the previous
annual period's budget projections or actual financial
results as shown on the financial statements.

guaranteed them individually and as petitioner's president. SCP gave the Canelos group the right to use the Dole trademark in connection with the distribution and sale of the products. In addition, the Canelos brothers gave SCP a nontransferable, nonexclusive license to use their ABC trademark[8] in connection with the distribution and sale of products for the duration of the contract.[9]

Petitioner agreed to arrange for consignment to SCP, for sale pursuant to the SCP contract, a minimum of 25 percent of the total aggregate production by the Canelos growers. Petitioner also agreed to be responsible for invoicing all sales arranged for or by SCP. Under the SCP contract, petitioner did not share in the net profits or losses of the joint venture, and its only compensation was its commission.

SCP separately paid for and provided additional marketing support to petitioner, including the following additional services to petitioner: Employing one or two SCP salesmen to work at petitioner's offices and help sell petitioner's produce;

---

[8]Although Mr. Canelos' father established and registered the ABC label in Culiacan, Mexico, petitioner registered the ABC label in the United States under petitioner's name when the Canelos group began dealing with Dole.

[9]The SCP contract allowed petitioner to use the Dole label and Dole to use the ABC label without specific charge. The benefit of usage of those labels was included in the commission rates charged.

providing National Trade Association advertising; providing booths at industry trade shows; and promoting petitioner's ABC label through association and advertising with Dole.

No written contract authorized petitioner to represent the Canelos growers in negotiations with SCP or to enter into the SCP contract. Although, in form, the SCP contract designated petitioner and SCP as the parties to the contract, the SCP contract stated, among other things, that both Mr. Canelos and Constantino, individually and on behalf of the Canelos growers, intervened in the agreement and agreed "to perform and be bound by all obligations, undertakings and duties incurred in the above Agreement by or as 'the Growers'."[10]

In 1988, by oral agreement, the Canelos group and SCP raised petitioner's commission rate under the SCP contract according to a formula that, in practice, gave petitioner a commission rate of

---

[10]By amendment dated as of Nov. 1, 1989, Frutave also "[intervened]" in the SCP contract and agreed "to perform and be bound by all obligations, undertakings and duties incurred in the Agreement by or as 'the Growers'."

55 cents per box during the years in issue.[11] Petitioner's per-box commission rate was not affected by produce price fluctuations.

In 1992, petitioner received a commission of 12 percent of gross sales for produce distributed for Productora in the Baja under the SCP contract.

In negotiating the SCP contract on behalf of petitioner, Mr. Maldonado reviewed petitioner's general accounting and production records and considered petitioner's fixed costs, its costs per box, the number of packs petitioner had sold in previous years, its previous years' income, and the available projections.

Dole's representatives prepared budgets and projections for the SCP deal from data, including information on volume and production, supplied by Mr. Canelos's farming operations. SCP incorporated the data into budget books which gave annual and historical data on the SCP deal. The Canelos brothers and Mr. Maldonado reviewed the data in the budget books for 1983 through 1993. The Canelos brothers, Mr. Maldonado, and representatives

---

[11]By oral agreement, the commission rate was amended commencing with the 1988-89 growing season as follows:

| Number of boxes | Commission per box |
| --- | --- |
| 14,000,000 or greater | $.35 |
| 12,000,000 to 13,999,999 | .40 |
| 10,000,000 to 11,999,999 | .45 |
| 8,000,000 to 9,999,999 | .50 |
| Less than 8,000,000 | .55 |

of Dole each agreed to the closing yearly summary sheets for the years 1985 to 1992 showing overall profits or losses for SCP, the Canelos growers, and petitioner.

Mr. Maldonado and petitioner's other employees provided information to SCP and Mr. Canelos regarding petitioner's day-to-day distribution function under the SCP contract. SCP's employees and representatives in Mexico obtained information directly from the Canelos growers regarding their day-to-day farming operations under the SCP contract. At the end of each growing season between 1989 and 1992, Mr. Maldonado reviewed data on petitioner's losses, and he provided Mr. Canelos with that data, thereby making Mr. Canelos aware that petitioner was losing money under the SCP contract.

Petitioner commingled funds advanced by SCP, received from produce sales, and lent by commercial banks, thereby making it impossible to trace funds from SCP to a specific grower. Petitioner's records do not show advances, including working capital and liquidation advances, to specific growers.

Dole generally used a per box commission rate for its distribution operations. Dole's normal commission charge during the years in issue was 55 cents per box. All of petitioner's contracts with Dole provided for a commission rate on the basis of boxes of produce. Although some of petitioner's competitors

charged commissions on a per-box basis, most of them charged on the basis of a percentage of sales.

Petitioner was included in the SCP deal because Dole wanted a U.S. company to be involved in the transaction.  No written contracts exist authorizing petitioner to represent the Canelos growers in negotiations with SCP or to enter into the SCP contract.  In the negotiations with Dole, Mr. Canelos and Mr. Maldonado negotiated on behalf of petitioner.  The Canelos brothers negotiated on behalf of the Canelos growers.  Mr. Canelos had overall authority over the negotiations with Dole on behalf of petitioner and the Canelos growers.

For year ending 1986, Dole estimated that the Canelos growers would export approximately 7 million boxes of tomatoes, in addition to approximately 3 million boxes of other produce. For the years in issue, the number of boxes of produce Dole estimated that petitioner would sell for the Canelos growers, and the number of packs actually sold, were as follows:

| FYE | Budgeted | Sold |
|------|------------|-----------|
| 1989 | 16,000,000 | 6,209,080 |
| 1990 | 19,000,000 | 6,188,221 |
| 1991 | 22,000,000 | 3,915,244 |
| 1992 | 25,000,000 | 2,794,408 |

For years ending before 1985, petitioner never sold more than 6,104,000 boxes of produce.  During the year ending 1985, petitioner sold 7,526,000 boxes.  For years ending after 1986,

petitioner never sold more than the number of boxes sold in the year ending 1985.

The SCP contract began in June 1985, and the first sales under the contract were reported on petitioner's tax return for the year ending 1986. Petitioner showed losses on its tax returns for all the years beginning with and following year ending 1986.

The SCP contract provided for an automatic 5-year extension absent notice of revocation given 1 year before its June 15, 1990, expiration date. In 1990, the SCP contract was extended automatically for 5 years when petitioner did not give SCP a notice of cancellation by June 16, 1989.

The Canelos growers did not pay U.S. income taxes on their share of the profits earned under the SCP contract.

Petitioner, the Canelos growers, and SCP terminated the SCP deal and extinguished all their obligations and business relationships under the SCP contract effective May 14, 1993. As part of the termination agreement and settlement of accounts between the Canelos group and SCP, the Canelos brothers and their related entities repaid advances SCP had made to petitioner.

The Canelos Organization

During the years in issue, the Canelos brothers used Canelos Hermanos, an unincorporated business association, as the name of the farming operations they jointly owned and operated. Canelos

Hermanos also did business as Empaque ABC, which referred to the Canelos Baja produce and a Canelos farm's packing shed in the Baja. Petitioner owned the ABC label and sold Canelos growers' No. 1 grade produce under that label, as well as under the Dole label.

Canelos Hermanos was the only Mexican grower, except for the otros growers, which shipped produce through petitioner from July 1, 1988, through August 7, 1989. Canelos Hermanos represented the Canelos farming operations with respect to Dole, SCP, and petitioner until 1989, when Frutave was formed and Canelos Hermanos no longer was used.

Mr. Canelos was chairman of the board of directors for Frutave from its incorporation on March 8, 1989, through 1992. Between August 8, 1989, and September 23, 1990, Frutave was the Canelos entity through which the Canelos growers operated under the SCP contract. Frutave was the only Mexican grower, except for the otros growers, which shipped produce through petitioner from August 8, 1989, through September 23, 1990. On November 1, 1989, Frutave agreed to be bound by the obligations, undertakings, and duties of the Canelos growers in the SCP contract and guaranteed petitioner's promissory notes entered into with SCP.

Mr. Canelos was the chairman of the board of directors of Adhota from its incorporation on September 24, 1990, through

1992. Adhota shipped produce through petitioner from September 24, 1990, through the time of trial. From September 24, 1990, Adhota was the Canelos entity through which the Canelos growers operated under the SCP contract.

Mr. Canelos was the general director of Productora from its incorporation on March 7, 1991, through 1992. Productora shipped produce through petitioner from March 7, 1991, through June 30, 1992. Productora bought the produce it distributed through petitioner from several farms.

During the years in issue, the Canelos family owned and controlled packing sheds in Mexico in Culiacan, Nio, and the Baja. The managers at the packing sheds reported to Constantino and other members of the Canelos farming operations. With the exception of the otros growers' produce, all Mexican produce distributed through petitioner came through those packing sheds. Canelos Hermanos, Frutave, Adhota, and Productora coordinated the distribution of the produce shipped through petitioner from the time that it left the packing shed until the time that the proceeds from the sale of the produce were returned to them. The majority of the produce sold under the SCP contract came from the Canelos family's Mexican packing houses.

Mr. Canelos was president of Transportes de Carga y Express (Transportes) during the years in issue. Transportes, a trucking company, transported the Canelos produce distributed through

petitioner and Apache from Mexico to petitioner's and Apache's warehouses in Nogales, Arizona. Most of the produce sold under the SCP contract was transported by Transportes.

During the years in issue, Mr. Canelos owned and operated SUNCO and Alcon, Inc. (Alcon), two Liberian corporations. SUNCO handled the loading and unloading of petitioner's produce on the Mexican side of the border. Alcon paid a portion of petitioner's promissory notes for advances from SCP under the SCP contract.

The Canelos brothers owned and controlled Apollo. Apollo did not sell or distribute produce for the Canelos growers. Apollo purchased cartons, seed, and various farming chemicals and resold them to the Canelos growers. Apollo also purchased cartons for petitioner's other growers. In addition, during the years in issue, Apollo rented warehouse space to petitioner in California and to Apache and Bud Antle, Inc. (Bud Antle), a wholly owned subsidiary of Dole, in petitioner's complex in Nogales, Arizona. Apollo gave Apache the lowest rental rate Apache could find for the warehouse it rented from Apollo.

Apollo and petitioner for years ending 1989 and 1990, and Apollo, petitioner, and RCLA for years ending 1991 and 1992, constituted a controlled group within the meaning of section 1563.

In his negotiations with Dole, Mr. Canelos attempted to reach an agreement that in the whole benefited his produce-

related businesses, including, but not limited to, petitioner, the Canelos growers, Transportes, Empaque ABC, and SUNCO.

Potential Comparable Transactions

### The Otros Growers

Petitioner distributed grapes, European cucumbers, squash, and melons for the otros growers. During the years in issue, produce from the otros growers that petitioner distributed did not include tomatoes. Petitioner charged them a commission rate of the greater of 55 cents per box or 10 percent of sales for services including border crossing, loading and unloading, warehousing, marketing, collecting of sales proceeds, liquidating the accounts, and distributing the sales proceeds. Petitioner retained 55 cents per box of the commission fees collected and gave any remaining portion of the fees to the Canelos growers. Petitioner also provided technical assistance and advances for seed, boxes, freight, customs brokerage expenses, and other expenses for which the otros growers reimbursed petitioner.

During the years in issue, petitioner sometimes made money advances, described as "adelantes" on petitioner's books, to the otros growers. The funds for the adelantes sometimes came from funds that SCP lent to petitioner for advances for the SCP deal. Petitioner generally made final liquidations to and paid all otros growers 30 to 40 days after the final sale of their produce.

Petitioner was the only entity within the Canelos organization that provided marketing or distributing services for the otros growers.  The Canelos growers did not provide any free services or supplies to the otros growers, such as free cartons, seed, picking, packing, transportation, or loading or unloading of trucks, except for technical assistance and other miscellaneous items provided to grape growers in 1992.  The Canelos growers had no contracts with the otros growers.  The otros growers did not report to Mr. Canelos.  They did not share in the split of profits between the Canelos growers and SCP under the SCP contract, and they received none of the proceeds from the Canelos growers.  Neither Mr. Canelos nor Constantino had any authority to represent the otros growers, and they did not perform any service for them.  No joint venture agreement existed between the otros growers and petitioner or SCP.  The otros growers were not a part of the SCP contract.

Apache

Apache began operating in 1986.  From 1987 through the time of trial, it sold and distributed the Canelos growers' No. 2 grade tomatoes.  Apache sold in different produce markets than the markets petitioner used to sell the Canelos growers No. 1 tomatoes.  Generally, No. 2 tomatoes sold at a lower price than No. 1 tomatoes.  The agreement between Apache and the Canelos growers relating to Apache's sales of the Canelos growers' No. 2

tomatoes in the SCP deal was not in writing. SCP received the same profit or loss split whether petitioner or Apache sold the Canelos growers' produce.

For the years 1988 through 1992, the Canelos growers' business represented between 70 and 90 percent of Apache's sales. Apache performed the same major distribution functions for the Canelos growers that petitioner performed for them. Apache did not provide financing for the Canelos growers. Apache used SUNCO's facility for crossing the border and paid SUNCO directly for that use. Apache did not advance money, seed, or boxes to its customers. Unlike petitioner, Apache purchased substantial amounts of produce and resold it in the years in issue. Petitioner handled the liquidation and transfer of funds to the Canelos growers for Apache. Apache occasionally used the Canelos growers' Mexican loading facilities.

In general, Apache charged the Canelos growers a commission rate of 5 percent of gross sales and a handling charge of 15 cents per box. In addition to the handling charge of 15 cents per box, Apache's commission rate for its other customers varied between 7 and 12 percent, depending on the services rendered.

Apache put the proceeds from the Canelos growers' sales in Apache's bank account. It kept those proceeds until petitioner or Mr. Canelos asked for the funds to be transferred to petitioner or distributed to Mr. Canelos. Those transfers

frequently were made several months after the Mexican produce growing season ending in April or May. For the years 1989 through 1992, Apache transferred sales proceeds from the Canelos growers' produce in the amounts of $11,651,670 to petitioner's account and $15,000 to the bank account of Mr. Canelos' wife.

On its Federal corporate income tax returns for years ending August 31, 1989, through 1992, Apache reported gross receipts of $705,566, $801,037, $756,640, and $270,999; interest income of $23,102, $89,078, $53,142, and $29,738; cost of goods sold of $353,850, $363,345, $228,847, and $11,281; and taxable income (loss) of $99,084, $78,104, $101,246, and ($278,837).

Mr. Padilla was Apache's primary salesman, and Apache had fewer employees than petitioner. Apache's fixed costs were lower than petitioner's fixed costs. Mr. Maldonado, on behalf of Mr. Canelos and the Canelos growers, and Mr. Padilla, on behalf of Apache, determined the commission rate that Apache would receive for selling the Canelos growers' produce. Mr. Maldonado had no selling, marketing, or operational responsibilities for Apache.

Bud Antle

Beginning in 1986 and continuing through a portion of 1989, Bud Antle distributed celery, brussels sprouts, and, subsequently, lettuce for the Canelos growers as part of the SCP deal. Initially, Bud Antle received a commission of 10 percent of sales, one-half of which was absorbed by SCP. Petitioner

received a commission of 40 cents per box from the proceeds of the produce sold for the services it performed in distributing brussels sprouts, celery, and lettuce for Bud Antle.

In November 1988, Bud Antle formally became a party to the SCP contract through a document entitled "Second Amendment to Sales Subagency Agreement" (Bud Antle amendment), wherein from November 1, 1988, to June 1, 1989, petitioner appointed Bud Antle as its subagent relating to the marketing and sale of lettuce, celery, and brussels sprouts grown by the Canelos growers in Mexico.  Under the Bud Antle amendment, the term "SCP" was defined to include Bud Antle.  SCP and Bud Antle shared in the profits from the sale of the produce covered under the SCP contract, as amended.  In addition, petitioner's commission of 40 cents per box was eliminated with respect to the produce sold by Bud Antle; instead, Bud Antle received a commission of 34 cents per box as compensation for services in distributing the lettuce, celery, and brussels sprouts.  Petitioner, nonetheless, received a commission of 20 cents per pack for border crossing and related services relating to the Canelos growers' produce that Bud Antle distributed for them.  In operation, Bud Antle did not receive its commission as a direct payment.  Rather, Dole made an internal allocation on its books and records to account for the commission.  SCP advanced financing to the Canelos growers for the produce included under the Bud Antle amendment.  Bud Antle

took full legal and beneficial title to the produce in Mexico after its harvest. William Heintz (Mr. Heintz)[12] negotiated the Bud Antle amendment on behalf of SCP and Bud Antle, and Mr. Canelos negotiated on behalf of petitioner.

On November 1, 1989, Bud Antle entered into an agreement with the Canelos growers and the Canelos brothers entitled the "Custom Farming and Crop Purchase Agreement" (Bud Antle Purchase Agreement). The term of the Bud Antle Purchase Agreement was November 1, 1989, through June 1, 1990. The Canelos brothers negotiated the terms of the Bud Antle Purchase Agreement on behalf of Frutave and themselves, and Mr. Heintz negotiated on behalf of Bud Antle. Under the Bud Antle Purchase Agreement, Bud Antle purchased and took full legal and beneficial title to lettuce, celery, and brussels sprouts grown by the Canelos growers in Mexico once the produce was harvested. As owner, Bud Antle sold the crops and collected the sales proceeds. Bud Antle reimbursed the Canelos growers for their estimated growing costs and then paid to the Canelos growers 55 percent of the net sales proceeds.[13] Bud Antle and the Canelos growers shared losses

---

[12]William Heintz served as vice president and general manager of SCP in 1983 and 1984 and as its president from 1985 through 1992. In addition, he served as president of Bud Antle in 1984 and a portion of 1985, after which he served as president of Dole Fresh Vegetables.

[13]Net sales proceeds were computed in part by subtracting
(continued...)

equally. Bud Antle was responsible for arranging delivery of the produce. Petitioner received a commission of 20 cents per box for its border crossing and some distribution services relating to the Canelos growers' produce sold by Bud Antle. The Bud Antle Purchase Agreement specifically stated that the parties to the contract operated as independent businesses and did not intend to create, and were not creating, among other things a partnership or a joint venture.

On November 1, 1989, Bud Antle leased a vegetable cold room, loading docks, a desk, and a telephone located in Nogales, Arizona, from Apollo.

Bud Antle also distributed produce in the United States for growers not related to the Caneloses. For its services for the unrelated growers, Bud Antle negotiated an overall pack charge for harvesting labor and equipment, cartons, selling, transportation, marketing, inventorying, warehousing, and collecting sales proceeds but which did not include any charges for customs, loading and unloading at the border, nor warehousing at the border. Bud Antle did not break down a commission rate in negotiating the overall pack charge, but for internal accounting

---

[13](...continued)
from sales proceeds the growing costs, transportation costs, petitioner's commission of 20 cents per box, and an allocation for Bud Antle's marketing charges (calculated at $35,000 a year plus 34 cents per box sold by Bud Antle).

purposes, Bud Antle allocated a commission of 55 cents per package for its services.  In addition to the pack charge, Bud Antle received a share of the profits from the domestic sales. Bud Antle did not perform any border-crossing activities for its domestic growers and took title to the produce grown by the domestic growers.

Bud Antle distributed the Canelos growers' lettuce, brussels sprouts, and celery produce from 1986 through 1991.

Van Dyke

In March 1988, petitioner entered into a marketing agreement (Van Dyke contract) with Van Dyke Farms (Van Dyke), an unrelated California grower.  Pursuant to the Van Dyke contract, petitioner agreed to market mix-melons for Van Dyke from May 1 through December 31, 1988, for a marketing commission of 8 percent of the selling price F.O.B. shipping point (Van Dyke deal).  In addition, Van Dyke reimbursed petitioner for the services of David Rojas, one of petitioner's employees.  Consequently, Van Dyke, in effect, paid a commission rate of 9.5 percent of sales, which for the Van Dyke deal was the equivalent of a commission rate of 56 cents per box.  Petitioner performed no services for Van Dyke other than marketing activities and loading and unloading services, for which Van Dyke reimbursed petitioner. Van Dyke handled the warehousing and transporting of the melons.

The Van Dyke contract did not involve border-crossing activities because Van Dyke was located in the United States.

Fresh Choice

Fresh Choice Produce, Inc. (Fresh Choice), a California corporation, was a distributor of green onions.  In February 1992, Fresh Choice entered into a commission merchant agreement (agreement) with Manuel Valladolid Seamanduras, on his own behalf and as representative of Agro Industrias Vigor S.R.L. de C.V. (Agro), a Mexican corporation, and Vessey & Co. (Vessey), a California corporation, in which each party agreed to share in the profits from the sale of green onions[14] grown by Agro in Mexico and marketed by Fresh Choice internationally (joint venture).  Fresh Choice's and Vassey's principal places of business were in the State of California.

Fresh Choice received a 25-percent share of the profits of the joint venture, Agro received a 50-percent share, and Vessey received a 25-percent share.  Profits were calculated net of expenses paid by Fresh Choice on behalf of the joint venture and of Fresh Choice's commission, which was computed as follows:

---

[14]Although the agreement on its face is limited to green onions grown by Agros and sold by Fresh Choice, it appears that the sale of brussels sprouts and snow peas also was included in the joint venture.

| F.O.B. Price per unit | Commission |
|---|---|
| $0 - $3.99 | $.25 |
| 4 - 5.99 | .35 |
| 6 - 7.99 | .45 |
| 8 and up | .55 |

Agro was responsible for all costs associated with growing, harvesting, packing, and delivering the green onions to Fresh Choice.

In the agreement, Fresh Choice agreed to perform all the work of transporting, receiving, storing, loading, distributing, and selling the green onions grown by Agro, to collect the sales proceeds, and to provide technical assistance. It served as importer of record of the green onions.

Fresh Choice also agreed to advance working capital funds, and, for that purpose, it provided a line of credit to Agro for which it received interest on loans against that line of credit. Vessey also provided financing for the joint venture.

Audit Determination

On audit, respondent determined that the 55-cent-per-box commission rate petitioner received from the Canelos growers did not constitute an arm's-length charge. Consequently, respondent increased petitioner's income for commissions from the Canelos growers by the following amounts:

| FYE | Commission income per return | Increase | Commission income as adjusted |
|---|---|---|---|
| 6/30/89 | $3,212,829 | $3,120,433 | $6,333,262 |
| 6/30/90 | 3,186,941 | 3,125,044 | 6,311,985 |
| 6/30/91 | 2,184,932 | 3,178,952 | 5,363,884 |
| 6/30/92 | 1,511,017 | 3,179,676 | 4,690,693 |

Respondent calculated the increased commission on the basis of petitioner's operating costs plus 54 percent of those costs.

OPINION

In General

Section 482[15] gives the Commissioner broad authority to allocate income, deductions, credits, or allowances between

---

[15]Sec. 482 provides:

> In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. In the case of any transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible.

commonly controlled organizations, trades, or businesses if the Commissioner determines that the allocation is necessary to prevent the evasion of taxes or clearly to reflect the income of the controlled entities.  The purpose of section 482 is to prevent the artificial shifting of the net incomes of controlled taxpayers by placing controlled taxpayers on a parity with uncontrolled, unrelated taxpayers.  See Seagate Tech., Inc. & Consol. Subs. v. Commissioner, 102 T.C. 149, 163 (1994); Sundstrand Corp. & Subs. v. Commissioner, 96 T.C. 226, 352-353 (1991); Bausch & Lomb, Inc. v. Commissioner, 92 T.C. 525, 581 (1989), affd. 933 F.2d 1084 (2d Cir. 1991); Edwards v. Commissioner, 67 T.C. 224, 230 (1976); sec. 1.482-1(b)(1), Income Tax Regs.  The Commissioner may make allocations under section 482 even in the absence of tax avoidance motives in order clearly to reflect the respective incomes of members of the controlled group.  See Central Cuba Sugar Co. v. Commissioner, 198 F.2d 214, 215-216 (2d Cir. 1952), affg. in part and revg. in part 16 T.C. 882 (1951).  Thus, establishment of a business purpose for a transaction does not necessarily insulate the taxpayer from a section 482 allocation.  See Bausch & Lomb, Inc. v. Commissioner, supra at 582.

The parties have stipulated that Mr. Canelos controlled petitioner and the Canelos growers within the meaning of section 1.482-1(a)(3) through (5), Income Tax Regs.  Accordingly, a

reallocation of income between petitioner and the Canelos growers is appropriate if the compensation paid to petitioner relating to its services for the related entities does not clearly reflect the true taxable income of the members of the controlled group. See Commissioner v. First Sec. Bank, N.A., 405 U.S. 394, 400 (1972); Hospital Corp. of Am. v. Commissioner, 81 T.C. 520, 594 (1983).

The regulations set forth an arm's-length standard to determine whether reallocations between controlled entities are needed. Thus, the regulations attempt to identify the "true taxable income" of each entity on the basis of the taxable income which would have resulted had the entities been uncontrolled parties dealing at arm's length. See sec. 1.482-1(b)(1), Income Tax Regs.

Respondent's determination as set forth in the notice of deficiency is presumptively correct, and petitioner bears the burden of disproving that determination. See Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Moreover, respondent's section 482 determination must be sustained absent a showing that he has abused his discretion. See Paccar, Inc. & Subs. v. Commissioner, 85 T.C. 754, 787 (1985), affd. 849 F.2d 393 (9th Cir. 1988). To succeed, therefore, petitioner first must show that respondent's section 482 allocations are arbitrary, capricious, or unreasonable. See G.D. Searle & Co. v.

Commissioner, 88 T.C. 252, 359 (1987). Whether respondent has exceeded his discretion is a question of fact. See American Terrazzo Strip Co. v. Commissioner, 56 T.C. 961, 971 (1971). In reviewing the reasonableness of respondent's determination, the Court focuses on the reasonableness of the result, not on the details of the methodology used. See Bausch & Lomb, Inc. v. Commissioner, supra at 582; Eli Lilly & Co. v. United States, 178 Ct. Cl. 666, 676, 372 F.2d 990, 997 (1967).

Should the taxpayer overcome the Commissioner's presumption of correctness and prove that the deficiencies set forth in the notice of deficiency are arbitrary, capricious, or unreasonable, but fail to prove that alternative allocations it proposes satisfy the arm's-length standard, the Court must determine from the record the proper allocation of income between or among the controlled entities. See, e.g., Sundstrand Corp. & Subs. v. Commissioner, supra at 354; American Terrazzo Strip Co. v. Commissioner, supra; Nat Harrison Associates, Inc. v. Commissioner, 42 T.C. 601 (1964).

In the notices of deficiency, respondent calculated that petitioner's commission income in total for the years in issue should be increased from $10,095,719 to $22,699,824, an increase of $12,604,105. Respondent now has adopted Dr. Daniel J. Frisch's (Dr. Frisch) opinion that petitioner's commission income

in total for the years in issue should be increased to $17,125,719, an increase of $7,030,000.

The deficiencies respondent adopted at trial are substantially lower than the amounts respondent determined and are based on a different methodology from the method used to calculate the notice amounts.  Accordingly, generally petitioner would need prove only that the commission it charged in the SCP deal satisfied the arm's-length standard.  See National Semiconductor Corp. & Consol. Subs. v. Commissioner, T.C. Memo. 1994-195.  Petitioner, however, contends that respondent's change in method of calculating the deficiency, from a cost-plus methodolgy to a comparable pricing methodology, raises new matter for which respondent bears the burden of proof.  We need not decide in this case whether respondent's use of a different method for calculating the deficiencies raises new matter because, as discussed infra, the preponderance of the evidence favors respondent.

Services Regulations

Section 1.482-2(b), Income Tax Regs., applies to transactions in which one related entity provides marketing, managerial, administrative, technical, or other services for another related entity for less than an arm's-length charge.  See sec. 1.482-2(b)(1), Income Tax Regs.  An arm's-length charge is defined as the "amount which was charged or would have been

charged for the same or similar services in independent transactions with or between unrelated parties under similar circumstances considering all relevant facts."  Sec. 1.482-2(b)(3), Income Tax Regs.  Unless the services are an integral part of the business activity of either the entity rendering the services or the entity receiving them, the arm's-length charge is deemed to be equal to all the costs or deductions incurred which are directly or indirectly related to the services performed. The taxpayer, however, may establish a more appropriate charge. See sec. 1.482-2(b)(3) and (4), Income Tax Regs.  The costs or deductions incurred in rendering the services, however, are not deemed equal to the arm's-length charge for services which are an integral part of the business activity of either the member rendering the services or the member receiving the benefit of the services.  See sec. 1.482-2(b)(7), Income Tax Regs.

Services are considered an integral part of the business activity of a member of a group of controlled entities if:  (i) Either the renderer or the recipient is engaged in the trade or business of rendering similar services to one or more unrelated parties; (ii) the renderer renders services to one or more related parties as one of its principal activities; (iii) the renderer is peculiarly capable of rendering the services and such services are a principal element in the operations of the recipient; or (iv) the recipient has received the benefit of a

substantial amount of services from one or more related parties during its taxable year.  See id.

During the years in issue, petitioner rendered marketing services to the unrelated otros growers similar to the marketing services it rendered on behalf of the related Canelos growers; therefore, the services petitioner rendered on behalf of the Canelos growers are considered an integral part of petitioner's business activity.  Sec. 1.482-2(b)(7)(i), Income Tax Regs. Consequently, an arm's-length charge for the marketing services rendered by petitioner relating to the SCP deal would be an amount that petitioner charged or would have charged an unrelated party for the same or similar services in an independent transaction under similar circumstances, considering all relevant facts.  Sec. 1.482-2(b)(3), Income Tax Regs.

Petitioner contends that the commission rate it charged in the SCP deal constituted an arm's-length rate.  Respondent contends, however, that a party dealing at arm's length on behalf of petitioner would not have accepted the SCP deal.

Expert Testimony

In support of their respective positions, each party has submitted the testimony of an expert witness or expert witnesses relating to what constitutes an arm's-length charge for the services petitioner rendered on behalf of the SCP deal.

Petitioner's Expert Witness

Petitioner submitted the expert report of Dr. Roberta Cook (Dr. Cook).  She has a Ph.D. in agricultural economics and is employed as an extension economist in the Department of Agricultural Economics at the University of California-Davis. Dr. Cook's major area of specialization is fresh fruit and vegetable marketing.  She also works in the broad area of food distribution.  Dr. Cook concluded that, taking into consideration the nature and volume of the products, as well as the functions performed and the risks assumed in petitioner's operations, petitioner was charging its related growers a commission rate consistent with industry standards and in accordance with section 1.482-2(b)(3), Income Tax Regs.

In assessing the arm's-length nature of petitioner's commission rate, Dr. Cook considered:  (1) Produce distribution industry standards; (2) distribution agreements between petitioner and unrelated parties, particularly SCP, but also Bud Antle, Apache, Van Dyke, and the otros growers; (3) comparable agreements between other unrelated parties (specifically Fresh Choice); (4) the nature of the products being distributed; (5) the volume of products being sold; (6) the types of functions and services performed; and (7) the risks assumed by the parties to the agreements.  Dr. Cook stated that the SCP contract was a third-party growing/marketing agreement between SCP, petitioner,

and the Canelos growers.  Dr. Cook concluded that comparable produce distribution agreements between unrelated parties provided the most reliable basis for establishing an arm's-length commission for petitioner.  According to Dr. Cook, taken as a whole, the third-party agreements and other industry agreements which she considered provided substantiation for the arm's-length nature of the commissions petitioner earned during the years in issue.

Dr. Cook stated that when petitioner entered into the SCP contract with Dole, petitioner agreed to a commission rate that was favorable given the large volumes that were expected to materialize.  According to Dr. Cook, in the low-margin food industry, firms make their profits on volume.  Dr. Cook asserted that commission rates are typically higher when distributors provide growers with advances to fund capital needs for planting, harvesting, packing, and transportation.  Dr. Cook noted that for the years in issue SCP, not petitioner, advanced funds to the Canelos growers.

According to Dr. Cook, for Nogales distributors of Mexican (dominated by Sinaloan) fresh produce, the common range of commissions was 5 to 12 percent of the gross selling price.  She asserted that the larger the volumes handled and the fewer the services provided by the distributor, the lower the commission rate.  She stated also that the financing of production,

harvesting, and packing costs are the main services that caused commission rates to be on the high end of the range. Dr. Cook further stated that some U.S.-based distributors also offered extensive technical assistance in the form of production methods to their Mexican growers, and many had field staff operating in Mexico. She asserted that where those costly services were provided, they were reflected in the commission rates, sometimes reaching 10 to 12 percent. According to Dr. Cook, when a distributor does not provide grower financing, the range is more likely between 5 and 10 percent; and when production-related technical assistance is not involved, the range tends to be between 5 and 8 percent. She stated further that volume, i.e., the overall size of the deal, also significantly affects the rate. Dr. Cook stated:

> In this case, it was SCP/Dole that funded advances to the Related Growers and thus bore the cost of tying up this capital. In addition, the SCP Deal was a large volume deal and economies of scale were applicable. GAC provided no production technical assistance or field personnel; while Dole itself performed part of the marketing services, via loaned salesmen and trade advertising.[18] Given these factors, GAC would not be expected to receive a commission at the upper end of the industry range. Rather, it is my opinion that given the large expected volumes and unique character of the SCP Deal, if a percentage commission rate would have been utilized, it would likely have been on the lower end of the typical range observed in Nogales, approximately 6 percent.

> [18]Dole provided one to two salesmen that worked at GAC's office in Nogales selling produce for GAC. These salesmen

were paid by Dole and were effectively loaned to GAC to help market SCP Deal produce through Dole connections.

Thus, Dr. Cook concluded that petitioner's commission rate of 55 cents per package was reasonably similar to the rate that would have been charged by an uncontrolled distributor negotiating with an uncontrolled grower under similar circumstances.

Respondent's Expert Witnesses

Respondent submitted the expert report of Dr. Frisch.  He has a Ph.D. in economics from Harvard University and is a managing director at Horst, Frisch, Clowery & Finan, Inc., an independent economic consulting firm specializing in transfer pricing and other tax-related matters.  Dr. Frisch's field of expertise is international tax in general and transfer pricing specifically.  Dr. Frisch concluded that the commissions petitioner received from the SCP deal during the years in issue were not arm's length.

Dr. Frisch asserted that the fact that petitioner's commission rate was mentioned in the SCP contract does not imply that the rate is arm's length.  Dr. Frisch stated that the owners of the Canelos group were interested in the group's overall profits from the SCP contract and, therefore, they might have been willing to accept a below-arm's-length commission rate for petitioner inasmuch as the Canelos organization as a whole would receive offsetting benefits from other provisions of the SCP

deal.  Therefore, had petitioner been independent, it might not have been willing to accept the commission rate specified in the SCP contract.  According to Dr. Frisch, the commission paid to petitioner was just one piece of the financial arrangement between Dole and the Canelos group.  He stated:  "While the arrangement as a whole was clearly arm's length, it is not possible to tell directly whether any one piece of it, taken in isolation, was something to which arm's-length parties would agree."

Dr. Frisch disagreed with Dr. Cook's opinion that the Van Dyke, Apache, or Bud Antle transactions were comparable to petitioner's transactions with the otros growers.  Dr. Frisch stated that petitioner did not perform the same functions for Van Dyke as it performed for the Canelos growers or for the otros growers.  In particular, the Van Dyke transactions did not involve border-crossing activities, Van Dyke did its own warehousing, and it arranged for the buyers to pick up the produce from its facilities.

As for the Apache transactions, Dr. Frisch stated that those transactions are not comparable to the SCP deal because the market for "off-grade" tomatoes handled by Apache was significantly different from the market for the high-quality tomatoes distributed by petitioner.  In the "off-grade" market, the customers consist of buyers who are interested in a value

buy, not in the quality of the product.  Thus, Dr. Frisch concluded, it would be inappropriate to use Apache's transactions as comparables for petitioner's transactions with the Canelos growers.

With respect to Bud Antle, Dr. Frisch asserted that, because Bud Antle was related to SCP and Dole, the commissions paid to it for marketing the Canelos growers' celery, lettuce, and brussels sprouts may have been affected by other aspects of the relationship between SCP and the Canelos group.  Additionally, Dr. Frisch also stated that, because petitioner and Bud Antle shared the commissions, it was not clear that Bud Antle performed the full range of marketing functions; instead, it may have merely assisted petitioner.

Dr. Frisch concluded that the 10-percent commission rate petitioner charged the otros growers was consistent with the 8- to 12-percent commission rates U.S. distributors charged for selling Mexican produce in Nogales, Arizona, and other places as stated in a study entitled "Competition in the U.S. Fresh Vegetable Industry", written by John A. VanSickle, Emil Belibasis, Dan Cantliffe, Gary Thompson, and Norm Oebker, and published by the U.S. Department of Agriculture, Economic Research Service, Agricultural Economic Report No. 691 (July 1994).  Dr. Frisch stated that petitioner's commission rate received from the otros growers was generally in line with

industry averages.  He asserted that the commission rate paid by the otros growers for petitioner's services was simply the 10 percent of sales actually paid by those growers to petitioner. He believed that the fact that petitioner paid a portion of the commissions to the Canelos growers does not change that fact.  He asserted that petitioner would not have made the payment to the Canelos growers had petitioner been an independent party operating at arm's length.  Dr. Frisch concluded that the commission rates paid by the otros growers provide the best evidence of an arm's-length commission rate for petitioner.

Dr. Frisch stated that petitioner performed essentially the same functions for the otros growers as it performed for the Canelos growers.  He stated that one difference in the transactions consisted of the quantities involved--over the years in issue, the otros growers accounted for approximately 3.3 percent of the total produce sold by petitioner, with the Canelos growers accounting for the rest.  According to Dr. Frisch, the normal practice for produce distributors was to charge the same commission to large growers as to small growers.  Thus, he stated, the fact that the Canelos growers were larger than the otros growers does not imply that they would pay different commission rates to an unrelated marketer.  Consequently, Dr. Frisch concluded that no adjustment to the otros growers' commission rate was needed for the difference in volume.

According to Dr. Frisch, an adjustment to the otros growers' commission rate was needed to account for a difference in the way in which petitioner forwarded the funds it received from the buyers on behalf of the Canelos growers. He stated that, for the otros growers, petitioner generally sent the funds to the growers approximately 30 days after the date of sale. However, for the Canelos growers, SCP lent working capital which petitioner advanced to the growers; after the sale of the produce, petitioner immediately credited the net amount, after expenses and commission, from the growers' outstanding balances instead of actually sending money. Thus, Dr. Frisch concluded, the Canelos growers ended up paying less interest to petitioner than they would have had petitioner waited approximately 30 days before giving the growers credit for the sale. He asserted that petitioner accordingly enjoyed a 30-day time-value-of-money advantage with the otros growers that it did not have in its dealings with the Canelos growers. Dr. Frisch said that the Canelos growers would be in an equivalent position if petitioner charged the Canelos growers the 10-percent rate with the otros growers' payment terms, or if it charged them an 11-percent rate with the actual payment terms it used for the Canelos growers.

Dr. Frisch asserted also that an adjustment to the otros growers' commission rate was needed to account for a service petitioner performed for the Canelos growers that it did not

perform for the otros growers.  In 1989 and 1990, petitioner made payments of $50,000 and $100,000 to Mr. Cecilio Espinosa (Mr. Espinosa), an employee of the Canelos brothers, or an entity controlled by them other than petitioner.  Those payments were related to his activities in managing Canelos growers located in the Baja.  According to Dr. Frisch, as a marketer, petitioner would not have made such payments to an employee of an unrelated group of growers (and did not make such payments to the otros growers).

Dr. Frisch stated that the adjustments he made improved the comparability of the otros growers' commissions and the Canelos growers' commissions by accounting for the latter two differences in the transactions between petitioner and the Canelos growers and petitioner and the otros growers.  He calculated that an arm's-length commission for petitioner for the years in issue would have been 94 cents when expressed as a per-package rate, or 11.06 percent when expressed as a percentage of sales. Accordingly, Dr. Frisch concluded that petitioner's commissions for the years in issue in total would have been $7,030,000 higher had petitioner been treated in an arm's-length fashion by the Canelos growers.  His calculation of the increase in commission income for each year is as follows:

| FYE | Amount |
|---------|-------------|
| 6/30/89 | $1,307,000 |
| 6/30/90 | 3,538,000 |
| 6/30/91 | 1,153,000 |
| 6/30/92 | 1,032,000 |
| Total | 7,030,000 |

Dr. Frisch used a profit-split analysis and a comparison with industry averages to test the reasonableness of his conclusions. He stated that the two reasonableness tests confirmed that applying the otros growers' commission rate, with adjustments, to petitioner's related-party transactions would result in petitioner's earning appropriate levels of income during 1989 through 1992. Further, he stated, those tests indicate that petitioner's income levels as reported on its tax returns for the years in issue were not consistent with arm's-length behavior. Therefore, Dr. Frisch concluded that it was necessary to adjust petitioner's commissions in order to make them consistent with the arm's-length standard.

Respondent also submitted the expert report of Enrique E. Figueroa (Dr. Figueroa). He has a Ph.D. in agricultural economics from the University of California-Davis and is employed as a research associate for the Department of Agricultural, Resource and Managerial Economics at Cornell University. Dr. Figueroa provided general background information on the produce industry.

Discussion

Petitioner contends that the SCP contract is an arm's-length agreement between two unrelated parties (i.e., petitioner and SCP) and, therefore, section 482 does not apply in the instant cases. On brief, respondent contends, on the other hand, that the SCP contract represents a complicated arrangement in which petitioner functioned as a member of a combined group, not as an independent negotiating party. The real issue, respondent asserts in effect, is whether the income petitioner reported on its U.S. corporate income tax returns for the years in issue pertaining to the SCP deal constitutes a reasonable allocation of petitioner's share of the Canelos organization's overall income from that deal for those years. The parties have stipulated that petitioner and the Canelos growers are controlled taxpayers within the meaning of section 1.482-1(a), Income Tax Regs.

While, on its face, the SCP contract was between Dole and petitioner, we are persuaded that, in substance, it was not merely between those two parties. Rather, in our view, the SCP deal, to which the SCP contract related, constituted a joint venture between Dole on the one hand and the Canelos organization on the other. It is clear from the record that Dole considered petitioner and the Canelos growers to be indivisible components of the Canelos organization and that it was with the Canelos organization that Dole agreed to do business. The commission

payable to petitioner was merely one part of the overall earnings due the Canelos organization relating to the SCP deal. How the Canelos organization internally allocated its share of the income generated by the SCP deal was inconsequential to Dole as long as Dole received its agreed-upon share of the joint venture's earnings. Thus, the question for decision is whether the income the Canelos growers allocated to petitioner pertaining to the SCP deal for the years in issue clearly reflected its share of the combined income of the controlled taxpayers. Accordingly, contrary to petitioner's assertion, section 482 does apply in the instant cases.

We must decide whether the commission rate paid petitioner in the SCP deal represents an arm's-length charge for its services. If it does not, then we must decide what would be an arm's-length charge for those services.

### Arm's-Length Commission Rate

Petitioner contends that Mr. Canelos and Mr. Maldonado negotiated a fair commission rate for the services petitioner rendered relating to the SCP deal, considering the expected volume, industry standards, and the amount SCP was willing to pay. Petitioner maintains that it wanted the highest possible commission it could obtain because the Canelos group kept 100 percent of any commission petitioner received but received only 55 percent of any farming profits.

Respondent contends that petitioner's 55-cent-per-package commission rate[16] was not negotiated at arm's length given that it did not even cover petitioner's fixed costs.  Respondent contends that the Canelos group agreed to an unprofitable commission rate for petitioner because they believed petitioner's losses would be offset by earnings from the SCP deal of other members of the Canelos organization.

Petitioner counters that, although Mr. Canelos was aware generally of the commission rate that petitioner would need to break even, he reasonably believed, on the basis of Dole's projections and the representations it would promote the Canelos growers' produce and increase sales, that petitioner could make a profit under the SCP deal.  Petitioner contends that had volume increased as Dole projected, petitioner's losses would have been eliminated.

---

[16]Petitioner asserts that the 55-cent-per-package commission rate converts to a rate of 6.6 percent of sales using a weighted average package price of $8.31 per package over the years 1989 through 1992.  Petitioner asserts further that the per-package rate would convert to a rate of 7.4 percent of sales if the unusually high 1990 prices were ignored.  Respondent disputes the accuracy of petitioner's percentage-of-sales calculations because the amounts are calculated on total Canelos growers' proceeds, not proceeds relating to sales made by petitioner.  Respondent does not indicate what the percentage-of-sales calculations would be on the basis of corrected sales data.  The precise percentage rate to which the 55-cent-per-package rate would equate is not in issue in the instant cases.  All we need know is that the 55-cent rate is substantially less than the 10-percent rate that was paid by the otros growers.

Respondent maintains, however, that by the first year in issue, it was unrealistic for petitioner to continue to rely on Dole's projections. Respondent contends that under similar circumstances an independent party would have demanded an increased commission rate before permitting the SCP contract to renew automatically at the end of its initial 5-year term. Petitioner, however, did not terminate the SCP contract even though the commission rate did not cover petitioner's expenses.

We agree with respondent that a party operating at arm's length would not have continued in the SCP contract under the terms of that contract. We are persuaded that, even before the years in issue, the Canelos group could not reasonably have expected to achieve the volume of 10 million boxes projected by Dole. Petitioner never had a profitable year while the SCP contract was in effect. We doubt that an unrelated third party would have been willing to continue in a similar unprofitable arrangement. In our view, from the inception of the SCP deal the Canelos brothers were not concerned with whether petitioner on its own realized a profit from the SCP deal but, rather, whether the Canelos organization as a whole prospered from the arrangement. Canelos-owned or controlled entities were involved in, and compensated for, all phases of the SCP deal including providing seed, cartons, and chemicals (Apollo), growing and packing the produce (Canelos Hermanos, Frutave, Adhota, or

Productora), loading and unloading it (SUNCO), transporting it (Transportes), and distributing it (petitioner).  The expenses related to the operations of those other entities, and we assume some profit to them, were paid from sales proceeds before calculating any profit or loss split.

We are persuaded that had petitioner been an unrelated party, it would never have agreed to retain the 55-cent-per-package commission rate for the years in issue.  We conclude that the 55-cent-per-package commission rate did not constitute an arm's-length rate.  The question then is what commission rate an unrelated party would have accepted for its services in the SCP deal.

Respondent contends that the otros growers' 10-percent commission rate serves as the best evidence of an arm's-length charge for the services petitioner rendered in the SCP deal.  The otros growers were unrelated customers of petitioner.  Respondent contends that petitioner's functions for the otros growers were in all important respects the same functions that petitioner performed for the Canelos growers.  Respondent maintains that, to be comparable, the 10-percent commission rate required only two adjustments to account for two additional services that the Canelos growers received that the otros growers did not.  Accordingly, respondent contends, for its services in the SCP deal petitioner should have charged a commission rate of 11.06-

percent-of-sales for the years in issue, which equates to a per-package rate of 94 cents.

Petitioner denies that the otros growers' commission rate is the best evidence of an arm's-length charge for the services petitioner performed in the SCP deal but maintains that the otros growers' commission rate is only one of several commission rates (i.e., rates charged by Bud Antle, Fresh Choice, Apache, and Van Dyke) that must be adjusted before being considered reasonable comparables. Petitioner contends that the 11.06-percent-of-sales commission rate suggested by Dr. Frisch, and adopted by respondent at trial, is based on flawed methodology and insupportable assumptions.

Petitioner agrees that the services it performed for the otros growers were similar to the services it performed for the Canelos growers. Petitioner, however, asserts that it provided additional services to the otros growers that Dr. Frisch did not take into account, such as providing technical assistance and advances in kind (boxes and seeds), as well as providing money advances. Petitioner contends further that Dr. Frisch inappropriately adjusted the otros growers' commission rate upward to account for a service that Dr. Frisch thought petitioner provided for the Canelos growers that it did not provide for the otros growers; i.e., that petitioner made funds available to the Canelos growers immediately upon the sale of the

produce, whereas petitioner delayed making funds available to the otros growers until 30 days after the sale. Petitioner maintains, however, that it credited all growers' accounts immediately upon sale. Therefore, petitioner contends, any use of a float adjustment would be arbitrary and inappropriate.

Petitioner also contends that Dr. Frisch did not adjust the otros growers' commission rate to reflect the distinction and character of the per-box rate structure used for the SCP deal as contrasted with the percentage of sales fee structure used for the otros growers' transactions. Petitioner asserts that Dr. Frisch used an after-the-fact analysis of a low-volume percentage commission rate structure to compare to a high-volume per-box rate structure.

Petitioner contends that in the produce industry economies of scale justify volume discounts, and that Dr. Frisch erroneously failed to adjust the otros growers' commission rate for volume considerations.

Petitioner contends also that Dr. Frisch failed to adjust the otros growers' commission rate to reflect the type of produce sold by the otros growers that had different handling and distribution considerations than the fresh tomatoes sold by the Canelos growers.

Respondent contends, on the other hand, that in arriving at her conclusions Dr. Cook did not place importance on: (1) The

relationships to each other of the contracting parties, (2) any compensation under the contract in addition to the commission, (3) how the cost structure and financial position of the alleged comparable compares to petitioner's cost structure and financial position, and (4) whether the parties to the contract examined actually performed the same services as did petitioner. Respondent also contends that there are inaccuracies in Dr. Cook's calculations.

Respondent contends that Bud Antle's arrangements with the Canelos growers and with its domestic growers varied significantly from petitioner's arrangement under the SCP deal and, therefore, the Bud Antle commission rate cannot serve as a reliable comparable in determining petitioner's arm's-length commission rate. Respondent asserts that Bud Antle received a share of the profits under its arrangements or received compensation in addition to its commission; it operated as part of Dole, making its transactions with SCP related-party transactions; and it did not perform any border-crossing services. Petitioner counters that the Bud Antle amendment is a reliable comparable for petitioner's commissions relating to the SCP deal. Petitioner maintains that the 34-cent-per-package commission was independent of the profit split and that the commission was paid for Bud Antle's selling services. According to petitioner, Bud Antle received its share of the profits, not

directly through the Bud Antle amendment, but indirectly through SCP because Bud Antle's farming operations were part of the SCP deal and SCP provided financing for the Bud Antle deal. Petitioner contends that the Bud Antle Purchase Agreement also is a reliable comparable for similar reasons. Petitioner further contends that Bud Antle is not related to petitioner and that petitioner had nothing to do with Bud Antle's selling function, which is comparable to petitioner's selling function. Additionally, petitioner contends that the lack of a border-crossing function does not prevent Bud Antle's other domestic deals from being comparable to the SCP contract, because the border-crossing costs are a direct charge borne by the grower.

We agree that Bud Antle's commission rate in the Bud Antle amendment and the Bud Antle Purchase Agreement is not a reliable comparable for petitioner's commission rate in the SCP deal. Bud Antle was related to Dole. Therefore, the 34-cent-per-package commission rate was not bargained for at arm's length. Furthermore, Bud Antle received additional compensation through a share of the profits and the $35,000 payment that petitioner did not receive.

Petitioner also contends that the Fresh Choice commission rate constitutes a comparable for petitioner's commission in the SCP deal. Respondent contends that the Fresh Choice joint venture is not comparable because it varied significantly from

petitioner's arrangement under the SCP contract. Respondent contends that Fresh Choice received more than the 55-cent commission rate because Fresh Choice received a share of the produce sale profits, a marketing fee, and interest on working capital loans which petitioner did not receive. Respondent asserts further that Fresh Choice's fixed costs cannot be compared to petitioner's fixed costs. Petitioner contends that in the Fresh Choice joint venture there were three transactions (equity contribution, equity line of credit, and distributing services) for which there were three forms of consideration (profit share, interest, and commission). According to petitioner, the 55-cent commission rate Fresh Choice received related only to its distribution function.

We agree with respondent that the additional compensation Fresh Choice received that petitioner did not receive makes Fresh Choice's commission rate an unreliable comparable for petitioner's commission rate in the SCP deal.

Petitioner also points to the 5-percent-of-gross-sales commission with 15-cent-per-box handling charge Apache charged the Canelos growers for selling their No. 2 grade tomatoes as a reasonable comparable to petitioner's 55-cent-per-package commission rate in the SCP deal. Petitioner contends that Apache provided the same major distribution services for the Canelos growers that petitioner provided.

Respondent contends that Apache's charges cannot serve as a comparable to petitioner's commission for the SCP deal because Apache had lower costs, received part of its income from the actual purchase and resale of produce, received special benefits from the Canelos group, had the use of millions of dollars of the Canelos group's funds for several months until the funds were transferred, and sold to a different market than the one to which petitioner marketed. Respondent contends further that Apache is not a reliable comparable because, although it did not technically belong to the Canelos group, it had very close ties to petitioner and the Canelos group, and it operated as a special preferred entity of the Canelos group.

In our view, the additional compensation Apache received in the form of interest earned on the Canelos growers' funds and the additional benefits Apache received from petitioner in the form of uncompensated services petitioner performed for Apache render the Apache commission an unreliable comparable for petitioner's commission rate in the SCP deal. The fact that Apache's commission rate for its other customers varied between 7 and 12 percent, depending on the services rendered, and indications in the record that Mexican growers typically paid a higher commission rate for similar distribution services[17] further

---

[17]In her writings, Dr. Cook has placed the commission rates
(continued...)

demonstrate that the 5-percent commission rate Apache charged the Canelos growers was not a reliable comparable for the SCP deal, especially in light of the fact that a 5-percent commission rate would have resulted in even higher losses than petitioner already incurred at the 55-cent-per-package rate.

Petitioner also contends that the Van Dyke commission rate of 8 percent of sales constitutes a reliable comparable for petitioner's 55-cent-per-package rate.  Respondent contends that the Van Dyke commission rate is not a reliable comparable because the Van Dyke deal was a limited melon deal for which petitioner provided fewer services, especially border-crossing services, than it provided for the Canelos growers in the SCP deal.

We agree that the 8-percent commission rate is not a reliable comparable.  Petitioner performed no services for Van Dyke other than marketing activities and loading and unloading services, for which Van Dyke reimbursed petitioner.  Van Dyke handled the warehousing and transporting of the melons.  The Van Dyke contract did not involve border-crossing activities.  Moreover, Van Dyke reimbursed petitioner for the salary of one of

[17](...continued)
charged by distributors to Mexican growers at 8 to 12 percent. The data on which Dr. Cook relied for those numbers came from the Confederacion de Asociaciones Agricolas del Estado de Sinaloa (CAADES) the largest Mexican grower association, and from the Mexican growers themselves.

petitioner's employees making the Van Dyke commission, in effect, 9.5 percent of sales.

We are persuaded that the 10-percent commission rate paid by the otros growers is the most reliable comparable commission rate for the marketing services petitioner rendered in the SCP deal. Petitioner performed substantially the same marketing services for the otros growers as it performed for the Canelos growers. The otros growers were not related to any of the principals in the SCP deal. Consequently, negotiations between petitioner and the otros growers were at arm's length. The otros growers also are Mexican growers. Consequently, their circumstances are more similar to the Canelos growers' than to the U.S. growers'. In addition, the commission petitioner received from the otros growers served as its only form of compensation for the marketing services petitioner rendered on their behalf.

We agree with respondent that the fact that petitioner paid a portion of the commissions to the Canelos growers does not require an adjustment of the 10-percent commission rate. The contractual arrangement petitioner had with the otros growers did not require that petitioner give them money advances. The otros growers, thus, agreed to pay and did pay petitioner the 10-percent commission rate regardless of whether petitioner advanced them funds. Petitioner's actions in forwarding to the Canelos growers the difference between the 10-percent-of-sales amount and

the 55-cent-per-package amount did not affect the fee the otros growers owed petitioner for services rendered on their behalf.

In its briefs, petitioner ignored the adjustment Dr. Frisch made to account for the payments petitioner made to Mr. Espinosa in 1989 and 1990 for services he rendered on behalf of the Canelos brothers or an entity controlled by them other than petitioner relating to the Canelos growers located in the Baja. In our view, an unrelated party would not have made those payments to Mr. Espinosa without seeking reimbursement from the Canelos growers. We believe, however, it is not appropriate to make an adjustment in the commission rate for the years in issue to account for those payments especially in light of the fact that those payments were not made throughout the years in issue. Rather, we believe that, had petitioner not been related to the Canelos growers, it would have sought direct reimbursement from them for the payments it made on their behalf to Mr. Espinosa, similar to the reimbursement petitioner sought and obtained from the Canelos growers and the otros growers when it paid other expenses relating to their operations. Accordingly, we believe, and so hold, that the adjustment for payments to Mr. Espinosa should come in the form of a direct reimbursement to petitioner in the amount of the payment.

Petitioner contends that no adjustment is needed for the time value of money because it credited all growers' accounts at

the time of sale.  Petitioner ignores the fact that it stipulated that an additional service it performed for the Canelos growers that it did not perform for the otros growers was to make sales proceeds available for immediate disbursement as soon as sales were made.  Dr. Frisch's 1-percent time-value-of-money adjustment is aimed at that additional service and appears justified. Petitioner has presented no data to support a lower adjustment for this factor; therefore, we accept the amount propounded by Dr. Frisch.

We do not agree with petitioner that an adjustment to the 10-percent commission rate is needed for volume considerations. We believe that, bargaining at arm's length, no unrelated party would be willing to grant a volume discount which would result in its consistently operating at a loss.  We also are persuaded that no adjustment is needed to reflect the variance between the type of produce petitioner sold for the otros growers and the type of produce petitioner sold for the Canelos growers.  The record does not provide sufficient evidence to support the use of that adjustment or, if it were appropriate, to quantify the amount of the adjustment.  Similarly, the record does not provide sufficient data to quantify adjustments petitioner claims are needed to account for alleged additional services it performed for the otros growers that it did not perform for the Canelos growers.

Furthermore, we do not agree with petitioner that a lower commission rate is justified because petitioner did not provide funding for the SCP deal.  SCP lent money to petitioner with which to make those advances.  Petitioner was principally responsible for repayment of those loans and for payment of the interest due on them.  We are persuaded that an unrelated party under similar circumstances would demand a commission rate in the higher range.

Accordingly, on the basis of the foregoing, we hold that for the years in issue income should be reallocated to petitioner in a manner to effect a commission rate of 11 percent of sales for the SCP deal produce petitioner sold during those years.  In addition, for 1989 and 1990, income should be reallocated to petitioner in the amount of any payments petitioner made to Mr. Espinosa on behalf of the Canelos growers.

To reflect the foregoing,

Decisions will be entered under Rule 155.

Appendix

The parties settled some of the adjustments determined in the notices of deficiency dated Sept. 28, 1995, and Feb. 23, 1996, as follows:

1.  Petitioner must recognize additional "other miscellaneous income" for year ending June 30, 1989, in the amount of $38,731.

2.  Petitioner must recognize additional "farm contract income" for year ending June 30, 1989, in the amount of $15,456.

3.  Petitioner must recognize "income from the sale of property" for year ending June 30, 1989, in the amount of $14,290.

4.  Petitioner must recognize "unreported commission income" for year ending June 30, 1990, in the amount of $42,787.

5.  Petitioner must recognize "pallet income" for years ending June 30, 1989 and 1990, in the amounts of $17,852 and $3,538, respectively.

6.  Petitioner is entitled to "foreign commission expense" deductions for years ending June 30, 1989 and 1990, in the amounts of $50,000 and $100,000, respectively.

7.  Petitioner has no "unrelated grower income" for years ending June 30, 1989, 1990, and 1991.

8.  Petitioner must recognize "commission income--unrelated growers" for years ending June 30, 1989, 1990, and 1991, in the amounts of $17,340, $27,475, and $184,616, respectively.

9.  Petitioner is entitled to deductions for "Mexican labor expenses" for years ending June 30, 1989, 1990, 1991, and 1992, only in the amounts of $36,840, $33,095, $48,243, and $30,245, respectively.

10.  Petitioner is entitled to deductions for "legal expenses" for years ending June 30, 1989, 1990, and 1991, only in the amounts of $15,700, $12,000, and $19,900, respectively. Petitioner is entitled to a deduction for "legal and accounting expenses" for year ending June 30, 1992, only in the amount of $17,177.

11.  Petitioner is entitled to deductions for "bad debt expense" for years ending June 30, 1989, 1990, 1991, and 1992, only in the amounts of $164,000, $49,201, $130,869, and $4,342, respectively.  Although respondent concedes this issue in the instant case, respondent does not agree that absorption of the bad debt expenses by petitioner, the produce distributor, for the grower is a practice common in the produce industry, but continues to maintain the positions that (1) a produce distributor's absorption of the bad debt expense for the grower is not a practice common in the produce industry, and (2) any bad debt expense absorbed by petitioner can be taken into account when calculating the section 482 commission adjustments and/or additions to tax or penalties.

12.  Petitioner must recognize a $525,000 gain for year ending June 30, 1990, from the sale of the RCLA Division to Alejandro Canelos.  In addition, petitioner does not have to recognize any gain from the sale of the RCLA Division for year ending June 30, 1991, and petitioner is not liable for any penalty under section 6662(a) for year ending June 30, 1991, relating to the sale of the RCLA Division property.  Petitioner is liable for a penalty under section 6662(a) for a substantial valuation misstatement as described in section 6662(e) for year ending June 30, 1990, relating to the $525,000 gain on the sale of the RCLA Division property.

13.  Petitioner is entitled to a deduction for "depreciation expense" for the year ending June 30, 1991, only in the amount of $214,798.

14.  Petitioner is entitled to a "net operating losses" deduction for year ending June 30, 1989, in the amount of $651,171.  The $651,171 is the entire allowable "net operating losses" deduction arising from years prior to year ending June 30, 1989.  Unless this Court's determination of the unresolved issue in the instant cases results in a "net operating loss" for any of the years ending June 30, 1989, 1990, or 1991, petitioner will not be entitled to carry forward any "net operating losses" to year ending June 30, 1992.

15.  Petitioner must recognize "additional income" for year ending June 30, 1992, in the amount of $19,645.

16.  Petitioner is entitled to a deduction for "charitable contributions" for year ending June 30, 1992, only in the amount of $4,470.

17.   Petitioner must recognize additional "interest income", computed under section 482, for year ending June 30, 1989, in the amount of $150,000.  The $150,000 is subject to an addition to tax under section 6651(a)(1).  The additions to tax under sections 6653(a)(1) and 6661(a) do not apply to the $150,000.

18.   Petitioner does <u>not</u> have to recognize any "interest income", computed under section 482, for years ending June 30, 1990, 1991, and 1992.  The penalties under section 6662(a), (d) do not apply to the "interest income", computed under section 482, for years ending June 30, 1990 and 1991.  There are no additions to tax under section 6651(a)(1) and (2), or penalty under section 6662(a) relating to the "interest income", computed under section 482, for year ending June 30, 1992.

19.   Section 59A controls the environmental tax deduction, and that deduction will be calculated based on the Court's final determination as to the taxable income for years ending June 30, 1989, 1990, 1991, and 1992.

20.   For the years in issue, petitioner was a member of a controlled group, as defined in section 1563.  The income tax brackets, environmental tax exemptions, and any other tax benefits described in section 1561, will be allocated equally among the members of the controlled group as specified in section 1561 for years ending June 30, 1989, 1990, 1991, and 1992.  For years ending June 30, 1989 and 1990, the controlled group consisted of petitioner and Apollo Produce Distributing, Inc. For years ending June 30, 1991 and 1992, the controlled group consisted of petitioner, Apollo Produce Distributing, Inc., and RCLA, Inc.