TRUST SERVICES OF AMERICA,
INC.; Toni Brotman Wald,
Plaintiffs–Appellees,

v.

UNITED STATES of America,
Defendant–Appellant.

No. 88–6069.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 10, 1989.

Decided Sept. 8, 1989.

Steven W. Parks, Washington, D.C., for defendant-appellant.

George E. Stephens, Jr., Robert S. Span, Paul Hastings, Janofsky & Walker, Los Angeles, Cal., for plaintiffs-appellees.

Before SCHROEDER, FLETCHER and TROTT, Circuit Judges.

TROTT, Circuit Judge:

The United States appeals the district court's judgment that the United States is not entitled to any setoffs against the es-

tate tax refund due Trust Services of America, Inc. and Toni Brotman Wald (collectively "Trust Services") in their capacity as cotrustees of the trust established by Alix Brotman Hodosh's will. The district court based its judgment on the alternative rationales that the United States was estopped from asserting affirmative defenses in the nature of setoff, and that both setoff claims lacked merit. We reverse in part, affirm in part, and remand so that the district court may enter an order consistent with this opinion.

## BACKGROUND

Alix Brotman Hodosh's first husband, David M. Brotman, died in 1973, leaving his wife 884,306 shares of common stock in General Health Services, Inc. ("GHS"). GHS is the parent company of the hospital Mr. Brotman founded, Brotman Memorial Hospital. The 884,306 shares of GHS stock that Alix Brotman Hodosh inherited constituted approximately thirty-five percent of all GHS shares outstanding.

In August of 1975, Alix Brotman Hodosh married Harold Hodosh, the driver and trainer of her horses. Mrs. Hodosh died on December 11, 1979 after having been in a coma for approximately one year. Her second husband and her daughter, Toni Brotman Wald, survived her.

The 884,306 shares of GHS stock constituted the principal asset of Mrs. Hodosh's estate. On the day Mrs. Hodosh died, GHS stock was quoted in the over-the-counter market at $19⅝ (the average of the bid and asked prices). This price represented an increase of approximately $16.75 per share, or $14,812,125 in total, over the value of the GHS stock at the time of the Hodosh marriage.

Mrs. Hodosh's will, dated October 22, 1976, was admitted to probate in Los Angeles Superior Court on or about March 25, 1980. Shortly thereafter Mr. Hodosh filed with the superior court a Petition for Confirmation and Determination of Community Property Passing Without Administration. In that petition Mr. Hodosh alleged that fifty percent of the enhancement in value of Mrs. Hodosh's GHS stock that had oc-curred during their marriage, or roughly $7.5 million, was his community property and should pass to him without administration. The coexecutors of Mrs. Hodosh's estate opposed this petition, and, after the parties represented that substantive settlement negotiations would be conducted, it was taken off calendar.

On September 11, 1980 Mrs. Hodosh's federal estate tax return was filed. The coexecutors of her estate discounted the $19⅝ per share, day-of-death value of the stock by twenty percent to reflect the size of the block of stock and the fact that the shares were unregistered. The GHS stock was thus valued at $15.70 per share on Mrs. Hodosh's federal estate tax return. A few months after this return was filed, and approximately one year after Mrs. Hodosh's death, all GHS stock was sold to Hospital Corporation of America for $31.85 per share.

In March of 1982, Mr. Hodosh filed a petition renewing his claim of entitlement to a community property interest in the enhancement in value of the GHS stock. Mr. Hodosh at this point calculated the value of his community property interest in the stock to be approximately $4 million. In May of 1982 the coexecutors reached an agreement with Mr. Hodosh whereby he was paid $375,000 in settlement of his community property claim in the GHS stock. The agreement noted that Mr. Hodosh maintained his assertion that the value of his community property interest in the stock was "greatly in excess" of $375,000, but that Mr. Hodosh had agreed to settle for $375,000 "in recognition of the possibility that he may not be successful in establishing such claims, in order to avoid continued protracted and expensive litigation in this matter, and for other personal reasons." The superior court approved this settlement on June 17, 1982.

The Internal Revenue Service ("IRS") concluded an audit of Mrs. Hodosh's return on December 21, 1982. In the course of this audit, the IRS allowed the $375,000 settlement to Hodosh to be deducted in full as a marital deduction, and the value of the GHS stock was increased to $16.83 per

share. This price was determined by the government, and, the IRS stated, "adjusted restricted stock to fair market value as of the date of death." The estate accepted without challenge this new valuation and paid the resulting increase in estate tax and the interest thereon.

On January 13, 1983, less than a month after concluding its audit of Mrs. Hodosh's estate, the IRS sent the estate an estate tax closing letter which stated:

This letter is evidence that the federal tax return for the estate has either been accepted and filed or has been accepted after the adjustment that you agreed to. This is not a formal closing agreement under Section 7121 of the Internal Revenue Code.[1]

We will not reopen this case, however, unless Revenue Procedure 74-5, reproduced on the back of this letter, applies.

Revenue Procedure 74-5 provides that reopening to make an adjustment unfavorable to the taxpayer will not occur unless: (1) there is evidence of fraud, malfeasance, collusion, concealment or misrepresentation of a material fact; (2) the prior closing involved a clearly defined substantial error based on an established service position existing at the time of the previous examination; or (3) other circumstances exist which indicate failure to reopen would be a serious administrative omission.

In February of 1984, Trust Services filed a claim with the IRS for a refund of federal estate taxes paid on behalf of Mrs. Hodosh's estate. Total federal estate taxes paid had amounted to $6,934,123; Trust Services sought a refund of $4,166,885. The demand for refund was based on the three claims: (1) the $4 million community property interest claimed by Mr. Hodosh

should have been excluded from Mrs. Hodosh's estate because Mrs. Hodosh had no interest in it at the time of her death; (2) Mr. Hodosh's $4 million claim was deductible under section 2053(a)(3) of the Internal Revenue Code as a "claim enforceable against the estate of decedent," and (3) statutory executor's commissions of $673,763 and extraordinary executor's commissions and legal fees of $1,579,656 were incurred after the closing of the estate tax audit and were deductible.

The IRS failed to take any action on Trust Services' refund claim within six months after it was filed. Pursuant to 26 U.S.C. §§ 6532(a)(1) and 7422(a), Trust Services brought an action for refund in federal district court; the complaint was filed on January 19, 1985. In its answer to Trust Services' complaint, the government claimed that any refund Trust Services was due would have to be setoff against the additional revenues due the government because: (1) the estate had erroneously been permitted to deduct the $375,000 payment it had made to Hodosh in settlement of his community property claim; and (2) the $16.83 per share valuation of the GHS stock, established as "fair market value" during the audit, was too low—the real value of Mrs. Hodosh's shares on the date of her death was $31.85 per share, the price for which the stock was sold the year after her death.

In the course of the litigation, Trust Services abandoned its first two claims for refund and settled with the government on the third. The parties agreed that, unless the district court found for the government on its setoff defenses, the estate would be entitled to a refund of $849,581. The only issues before the trial court were thus the

---

1. Section 7121 provides as follows:

CLOSING AGREEMENTS

(a) AUTHORIZATION—The Secretary is authorized to enter into an agreement in writing with any person relating to the liability of such person (or of the person or estate for whom he acts) in respect of any internal revenue tax for any taxable period.

(b) FINALITY—If such agreement is approved by the Secretary (within such time as may be stated in such agreement, or later agreed to) such agreement shall be final and conclusive, and except upon a showing of fraud or malfeasance, or misrepresentation of a material fact—

(1) the case shall not be reopened as to the matters agreed upon or the agreement modified by any officer, employee, or agent of the United States, and

(2) in any suit, action, or proceeding, such agreement, or any determination, assessment, collection, payment, abatement, annulled, modified, set aside, or disregarded.

26 U.S.C. § 7121.

two setoff issues raised by the government.

The district court found against the government on the merits of both issues, and on the alternative basis that the government was equitably estopped from asserting its setoff defenses because of the government's representation in its estate tax closing letter that it would not reopen the case unless one of the conditions detailed in Revenue Procedure 74–5 occurred. The government timely appeals this judgment.

## ANALYSIS

*Equitable Estoppel*

■ In holding that the government was foreclosed from asserting its setoff defenses, the district court took the view that sending out an estate tax closing letter estops the government, as a matter of law, from claiming setoff defenses in a refund action. We review such a holding *de novo*.

The district court based its finding that the government was foreclosed from asserting both setoff defenses on *Law v. United States*, 83–1 U.S.T.C. ¶ 13,514, 1982 WL 1733 (N.D.Cal.1982). The facts in *Law* are quite similar to those in the instant case. The major asset of the estate [at issue] in *Law* was a ranch. During an audit of the federal estate tax return, the IRS increased the valuation of the ranch. After the estate had timely paid the additional taxes, the IRS sent the estate an estate tax closing letter (Form L–154) identical to the letter the IRS sent Trust Services in this case. When the estate sued for a refund, the government sought to reopen the return, reappraise certain assets in the estate, and setoff any tax deficiency against any refund found to be due the estate.

As in the instant case, in *Law* the government did not argue that any of the three circumstances in which reopening is permissible under Procedure 74–5 applied. Instead, it asserted, as does appellant here, that the estate tax closing letter was not relevant because the taxpayer, rather than the government, had reopened the case by suing for a refund. The *Law* court rejected this argument, reasoning, as follows, that the government was estopped from reopening the return on a basis that was not listed in the estate tax closing letter:

> Although the government has the right to re-audit a return and raise any tax deficiency as a setoff to any refund due, see *Lewis v. Reynolds*, [3 USTC ¶ 856], 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293 (1932), the government is estopped from asserting that right in plaintiffs' case by its use of Form L–154. If the listed circumstances were not exhaustive of the circumstances under which a return would be reopened the government could have phrased the form to reflect that fact, or could have refrained from sending out the form altogether. The fact that the form was sent out and phrased in non-equivocal terms indicates that the government intended the taxpayer to rely on it. Furthermore, actual reliance on the form would be justifiable because it is reasonable for the taxpayer to assume that the L–154 is not meaningless. In this case, had the government expressly reserved the right to reopen plaintiffs' return should plaintiffs bring suit for a refund, plaintiffs might have decided that the possible gain from such a suit was not worth the effort. Thus, plaintiffs' reliance was both actual and detrimental.

83–1 U.S.T.C. ¶ 13,514, 87,278.

We agree with the district court that *Law* sets forth a compelling argument. We believe, however, that the district court incorrectly concluded that the logic of *Law* applies equally to both of the government's setoff defenses. Neither *Law* nor the equity concerns it expresses justify foreclosing the government from asserting its first setoff defense, i.e., that the $375,000 marital deduction for the settlement payment to Mr. Hodosh should be disallowed.

The first two counts of Trust Services' complaint in its refund action and the first setoff defense concern the same issue: the estate tax consequences resulting from Mr. Hodosh's claim to a $4 million community property interest in the GHS stock. Count

One of Trust Services' complaint asserts that this sum was properly excludable from Mrs. Hodosh's gross estate because she had no interest in it at the date of her death. Under 26 U.S.C. § 2033, a surviving spouse's community property is excluded from the gross estate and thereby from the taxable estate. *See Ahmanson Foundation v. United States,* 674 F.2d 761, 773 (9th Cir.1982). Count Two argues in the alternative that Mr. Hodosh's community property claim was properly deductible under 26 U.S.C. § 2053(a)(3) as a "claim against the estate." The first setoff defense claimed by the government also concerns, albeit less directly, the tax consequences of Mr. Hodosh's purported $4 million community property interest. As described above, Mr. Hodosh settled his claim with the coexecutors for $375,000. The government permitted Trust Services to take this settlement as a marital deduction on the final audited return.

■ We recognize that there are differences between the basis of the first two counts of Trust Services complaint and that of the first setoff defense. The complaint refers to an alleged community property interest and the first setoff defense to the settlement based on that allegation. And, the community property exclusion and the marital deduction are technically different.[2] We find nonetheless that both the refund suit and the first setoff defense concern aspects of Mr. Hodosh's community property claim.

■ *Law* acknowledged, although the district court here did not, that the government cannot be estopped from reevaluating the tax consequences of the items on which the taxpayer's claim for refund is based. *See Law v. United States,* 83–1 U.S.T.C. at 87,278 n. 1 (citing *Hicks v. United States,* 486 F.2d 325, 329 (10th Cir.1973)); *cf. Bull v. United States,* 295 U.S. 247, 262, 55

S.Ct. 695, 700, 79 L.Ed. 1421 (1934) ("[R]ecoupment is in the nature of a defense arising out of some feature in the transaction upon which the plaintiff's action is grounded. Such a defense is never barred by the statute of limitations so long as the main action is itself timely."). We realize that Trust Services eventually abandoned the first two counts of its complaint. It remains the case, however, that Trust Services reopened the broad issue of the tax consequences of Mr. Hodosh's allegations of a $4 million community property interest when it demanded a refund based on that interest. Following the teaching of *Bull,* we hold that Trust Services cannot now allege that the estate tax closing letter forecloses the government from reconsidering this issue.

We turn now to the issue of whether the district court correctly decided that equitable estoppel prohibits the government from asserting its second setoff defense, that the GHS stock was undervalued in the final audited return. We do not condone the government's behavior in this case. If the government does not view an estate tax closing letter as binding in a refund suit, it should say so in the letter. Because we find that the district court was not clearly erroneous in holding against appellant on the merits of this issue, however, we do not deem it necessary to address the question of whether the estate tax closing letter estops the government from claiming the second setoff defense.[3] Whether or not we were to find the government estopped, it would not prevail on the valuation issue.

*The Merits*

The Burden of Proof

■ The government here bears a threshold burden of "going forward," of establishing that its equitable setoff defenses to this tax refund suit are "made in

---

**2.** The former is excluded from the gross estate and the latter is included in the gross estate but then deducted from the taxable estate. *See Ahmanson v. United States,* 674 F.2d 761, 773 (9th Cir.1982).

**3.** Although we decline to consider the application of equitable estoppel to the assertion of setoff defenses unrelated to the items on which

the claim of refund is based, we note that such consideration would properly include discussions of the presence or absence of the requisite elements of estoppel against the government and of the implications of *Whitney v. United States,* 826 F.2d 896 (9th Cir.1987), as well as of *Law.*

good faith, rather than for improper purposes of deterrence and harassment." *Ahmanson*, 674 F.2d at 777. Once the government has shouldered this burden, the taxpayer bears the burden of persuading the court that the deductions, exclusions or valuations in question were proper. *Id.* The district court chose to consider both setoff defenses in this case as if the burden of proof had shifted to Trust Services. We do not find this decision to have been in error.

The Marital Deduction

■ The district court concluded that Trust Services had established the deductibility or excludability of the $375,000 payment to Mr. Hodosh. We review this conclusion under the clearly erroneous standard. *Id.* at 775.

■ Under *Ahmanson*, the marital deduction or community property exclusion[4] requires that the surviving spouse have an enforceable right (to the amount deducted or excluded) under the applicable state law. *Id.* It is not adequate for marital deduction or community property exclusion purposes that the state law claim be sufficiently plausible to support a good faith arm's length settlement. *See id.* As explained above, Mr. Hodosh claimed to have a community property interest in the enhancement in value of the GHS stock, which was Mrs. Hodosh's separate property, that occurred during their marriage. Under California law, profits accruing from a wife's separate property are generally also separate property. *Beam v. Bank of America*, 6 Cal.3d 12, 17, 490 P.2d 257, 260, 98 Cal.Rptr. 137, 140 (Cal.1981). Income arising from the wife's "skill, effort and industry" is, however, community property: "[T]he community property should receive a fair share of the profits which derive from the [wife's] devotion of more than minimal time and effort to the handling of [her] separate property." *Id.* Once the court determines that at least some of the increment in value is community property

under the standard articulated above, it must calculate the exact amount of community property by either the *Pereira* method, which "allocate[s] a fair return on the [wife's separate property] investment [as separate income] and [allocates] any excess to the community property as arising from the [wife's] efforts," or the *Van Camp* approach, which allocates as community property the reasonable value of the wife's services. 6 Cal.3d at 18, 490 P.2d at 261, 98 Cal.Rptr. at 141 (quoting *Pereira v. Pereira*, 156 Cal. 1, 7, 103 P. 488 (1909) and *Van Camp v. Van Camp*, 53 Cal.App. 17, 27–28, 199 P. 885 (1921)). Once a court has ascertained the amount of community income by either method, it must deduct the community's living expenses from the community income to arrive at the amount of community property. 6 Cal.3d at 21, 490 P.2d at 263, 98 Cal.Rptr. at 143.

■ The record reveals that Trust Services completely failed to demonstrate that a court properly interpreting California law would assign Hodosh a $375,000 community property interest as a result of the enhancement in value of GHS stock during his marriage to Mrs. Hodosh. Mrs. Hodosh married Mr. Hodosh in 1975. She died in 1979. Trust Services did not offer any evidence that Mrs. Hodosh expended more than minimal time and effort on the enhancement of the GHS stock's value during the three years of that period in which she was not in a coma. Although it did state that "Messrs. Greenberg, Mitzenmacher and Gother further testified that, in her capacity as director, the decedent participated in the affairs of GHS," the district court followed Trust Services in failing to perform the required factual analysis of Hodosh's claim to community property. Judge Whelan's conclusion that Trust Services had satisfied its burden of proof as to the deductibility or excludability of its $375,000 settlement payment to Hodosh is thus clearly erroneous.

■ The district court found in the alternative that the $375,000 was properly

---

**4.** We follow *Ahmanson* and the parties in assuming that the legal issues will be the same whether the $375,000 settlement with Hodosh

implicates the marital deduction or the community property exclusion. *See Ahmanson,* 674 F.2d at 773.

deductible under 26 U.S.C. § 2053(a)(3) as a "claim against the estate." The language of section 2053 precludes such a finding. Section 2053(c)(1)(A) requires that the deduction for claims against the estate be limited to claims that "were contracted bona fide and for an adequate and full consideration in money or money's worth...." Section 2043(b)(1) of the Internal Revenue Code explicitly states that relinquishment of marital rights in the decedent's property or estate "shall not be considered to any extent a consideration 'in money or money's worth'." The only consideration given by Mr. Hodosh in return for the $375,000 was relinquishment of his claim to a community property interest in the GHS stock. Under section 2043(b)(1), such consideration does not bring the underlying claim within the ambit of section 2053(a)(3). *Cf. Estate of Isadore Rubin*, 57 T.C. 817, 823 (1972) (holding that section 2043(b) precludes relinquishment of a wife's inheritance rights from being considered a "claim against the estate" under section 2053). The district court therefore erred in finding that the $375,000 was deductible as a "claim against the estate."

### Valuation of the Stock

The second setoff defense the government raised in response to Trust Services' claim for refund was that the 884,306 shares of stock should have been valued at $31.85 per share rather than the $16.83 per share agreed upon during audit. The district court rejected this defense and concluded that the GHS stock should have been discounted twenty-five percent from its publicly traded price on the day Mrs. Hodosh died and that its correct estate valuation was therefore $14.72 per share.[5] Appellant contends that the district court erred in refusing to impute a forty-three percent premium to the GHS shares to reflect the effective control inherent in ownership of thirty-five percent of the company's stock, and in excluding evidence meant to rebut the testimony of the estate's expert witness and evidence offered to demonstrate that the acquisition of GHS

was foreseeable at the date of Mrs. Hodosh's death.

■ The valuation of stock is a question of fact, reviewed under the clearly erroneous standard. *See Ahmanson*, 674 F.2d at 769. In considering a district court's valuation of stock, it is useful to keep in mind that "valuation issues are inherently imprecise and capable of resolution only by Solomon-like pronouncement." *Gilford v. Commissioner*, 88 T.C. 38, 50 (1987).

The parties agree as to the appropriate framework within which to determine valuation. IRS regulations define the value of stocks or bonds as their "fair market value at the time of the decedent's death." *See* 26 C.F.R. § 20 2031–1(b). If there is a market for the stocks or bonds, "on a stock exchange, or an over-the-counter market or otherwise," the "fair market value" of those stocks or bonds is "the mean between the highest and lowest quoted selling prices on the valuation date." *Id.* In *Gilford v. Commissioner*, the tax court expanded helpfully on how to determine the fair market value of stock sold on an open market.

> Thus, in valuing stock which is sold on an active market, the estate tax regulations delineate a three-fold test to determine the fair market value of stock. First, if there is a market on a stock exchange or an over-the-counter market, the regulations look to the selling prices on or within a reasonable period before and after the valuation date. Second, in the absence of actual selling prices, the bid and asked prices are examined. Finally, if the selling prices or bid and asked prices do not reflect accurately the fair market value of the stock, reasonable modification of the selling prices or the bid and asked prices may be considered.

88 T.C. at 49.

■ The district court properly followed this procedure. It based valuation of the stock on the bid and asked prices discounted to reflect the restrictions on the

---

5. By upholding the district court's valuation we are not opening the door for further litigation: The period of time for filing a claim for credit or refund has expired. *See* 26 U.S.C. § 6511(a).

sale of the stock. Depending on the circumstances, such a discount for restricted stock is appropriate: "[I]f stock is subject to resale restrictions under the federal securities laws which prevent it from being sold freely in the public market, a discount from the mean may be necessary to measure the stock's value accurately." *Id.* at 59 (citations omitted). Given the evidence considered by the district judge, we cannot hold that it was clear error for him to have found that it was appropriate to attach a discount rather than a premium to Mrs. Hodosh's stock.

 We must now consider whether the district court erred in excluding evidence offered to rebut the testimony of Trust Services' expert valuation witness, Mr. Braun. The government wished to introduce testimony by Mr. Margulis to the effect that the fact that the stock was restricted would have no impact on the determination of whether or not a premium should be accorded for fair market value. Although the district judge would have had discretion to admit this testimony, his refusal to admit it did not constitute an abuse of discretion. The government cross-examined Mr. Braun extensively. Moreover, contrary to the government's assertion that extrinsic evidence may always be adduced to rebut or impeach the direct testimony of a witness, the trial judge has broad discretion over whether to admit such evidence in rebuttal. *See United States v. Benedetto,* 571 F.2d 1246, 1250 (2d Cir.1978) ("Once a witness (especially a defendant-witness) testifies as to any specific facts on direct testimony, the trial judge has broad discretion to admit extrinsic evidence tending to contradict the specific statement, even if such statement concerns a collateral matter in the case.").

 Finally, we must determine whether the district court erred in excluding evidence intended to demonstrate that the acquisition of GHS was foreseeable at the time of Mrs. Hodosh's death. Subsequent events, like the acquisition of GHS that took place approximately one year after Mrs. Hodosh died, are not considered to fix fair market value, except to the extent that they were reasonably foreseeable at

the date of valuation. *Gilford,* 88 T.C. at 52. The rule against admission of subsequent events is a rule of relevance. *Id.* at 53. We review a district court's decision regarding the relevancy of evidence under the clearly erroneous standard. *See United States v. Burreson,* 643 F.2d 1344, 1349 (9th Cir.1981), *cert. denied,* 454 U.S. 830, 847, 102 S.Ct. 125, 165, 70 L.Ed.2d 106, 135 (1981).

 The district court treated the evidence proffered by the government as if it related entirely to post-death events. In fact, the evidence would have established that, prior to Mrs. Hodosh's death, one of GHS's directors had been instructed to find a purchaser or merger candidate for GHS. It would have been within the court's discretion to admit such evidence as probative of the foreseeability of the merger. *See Gilford,* 88 T.C. at 54. Given the thinness of the pre-death evidence and the dubious relevance of post-death evidence to the foreseeability of the merger at the date of death, however, it was also within the court's discretion to decline to admit it.

Thus, none of the government's objections to the district court's valuation of the stock are compelling. We affirm this portion of the district court's opinion.

### CONCLUSION

For the foregoing reasons, we reverse the district court's judgment regarding the marital deduction for the settlement payment to Mr. Hodosh and affirm its conclusion as to the valuation of the GHS stock. We remand so that the district court may restore the $375,000 marital deduction to the taxable estate, recalculate the estate's tax liability accordingly, and offset any amount due the government against the refund owed Trust Services.

REVERSED in part, AFFIRMED in part, and REMANDED.