DHL CORPORATION AND SUBSID-
IARIES, Petitioner–Appellant,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent–
Appellee.

Commissioner of Internal Revenue,
Petitioner–Appellant,

v.

DHL Corporation and Subsidiaries,
Respondent–Appellee.

DHL Corporation and Subsidiaries,
Petitioner–Appellant,

v.

Commissioner of Internal Revenue,
Respondent–Appellee.

DHL Corporation and Subsidiaries,
Respondent–Appellee,

v.

Commissioner of Internal Revenue,
Petitioner–Appellant.

Nos. 99–71580, 00–70008, 99–
71592 and 99–71675.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 9, 2001.

Filed April 11, 2002.

Jerrold J. Ganzfried, Howrey & Simon, Washington, DC, and Edwin V. Wood-

some, Jr., Howrey Simon Arnold & White, Los Angeles, CA, for petitioner-appellant DHL Corp.

Jonathan S. Cohen, United States Department of Justice, Tax Division, Washington, DC, for respondent-appellee CIR.

Before BEEZER, O'SCANNLAIN and W. FLETCHER, Circuit Judges.

## OPINION

WILLIAM A. FLETCHER, Circuit Judge.

Petitioner DHL Corporation ("DHL") appeals the tax court's affirmance, in part, of the Commissioner of Internal Revenue's assessment of income tax deficiencies and penalties against petitioner for the tax years 1990–1992, based on the Commissioner's power to reallocate income between controlled entities under 26 U.S.C. § 482. Petitioner specifically appeals (1) the § 482 allocation to DHL of additional income arising from DHL's sale to Document Handling Limited, International ("DHLI") of the "DHL" trademark, which the tax court valued at $100 million; (2) the allocation of income to DHL for uncharged royalties from DHLI's use of the "DHL" trademark prior to the sale; and (3) the imposition of penalties under 26 U.S.C. § 6662 triggered by these deficiencies.

The tax court had jurisdiction under 26 U.S.C. §§ 6213–6214, 7442, and this court has jurisdiction under 26 U.S.C. § 7482(a)(1). We reverse the tax court's § 482 allocations to DHL of the value of the foreign trademark rights and unpaid royalties, and reverse the assessment of penalties under § 6662. We otherwise affirm.

## I

The tax court opinion provides a detailed account of the various companies' histories, structures, and dealings. *DHL Corp. v. Comm'r*, 76 T.C.M. (CCH) 1122 (1998). Here we provide a summary of the relevant facts.

### A. The DHL Network

Adrian Dalsey, Larry Hillblom, and Robert Lynn formed DHL Corporation ("DHL"), a package delivery company, in California in 1969. Document Handling Limited, International ("DHLI"), was incorporated in Hong Kong in 1972. Generally, independent local agents conducted the international operations and paid a network fee to DHLI. Middleston, N.V. ("MNV"), incorporated in 1979, owned most of the overseas local operating companies. At trial before the tax court, DHL conceded that, because of overlapping stock ownership, common control existed among DHL, DHLI, and MNV for all relevant times up to December 7, 1990.

From 1972 to 1992, DHL and DHLI/MNV were part of a global network in which DHL handled United States operations exclusively and DHLI/MNV handled foreign operations. DHL delivered DHLI's America-bound shipments, and DHLI delivered DHL's foreign-bound shipments. Until 1987, each company kept for itself the full amount paid by the local customer, and the companies did not exchange fees. Each company also paid for its own advertising expenses in its respective markets. A network steering committee, a specially formed corporation, and other mechanisms coordinated the worldwide DHL network. In 1988, a Worldwide Coordination Center was established in Belgium, with the world operations of the DHL network divided into three regions, each with its own CEO. DHL struggled in the competitive American market, sustain-

ing losses during the 1980s, but DHLI/ MNV expanded rapidly and profitably.

### B. The "DHL" Trademark

In 1974, DHL and DHLI entered into a Memorandum of Oral Agreement ("MOA"), under which DHL licensed the name "DHL" to DHLI for five years, terminable by DHL on 90 days notice. Under the MOA, DHLI would be prohibited from using the "DHL" name for five years after termination. The MOA did not include any provision for the payment of royalties by DHLI to DHL for use of the "DHL" trademark. Through a series of amendments, the MOA was extended through 1990.

In 1977, DHL began the process of registering the "DHL" trademark in the United States. DHLI commissioned the first "DHL" logo, which was then used worldwide. Beginning in 1983, DHLI incurred the expenses of registering the "DHL" trademark under DHLI's name in various foreign countries.

On December 7, 1990, DHL and DHLI entered into a new agreement. Under its terms, DHL had the exclusive right to use and sublicense the "DHL" trademark in the United States, and DHLI had corresponding rights overseas. The agreement included reciprocal performance standards, and DHL and DHLI agreed to compensate each other, at cost plus 2%, for any shipment imbalances between the two entities. The agreement was terminable only for cause and had a 15–year term, with an automatic 10–year renewal if both parties were satisfied. If the agreement was terminated, DHLI would be prohibited from using the "DHL" trademark for 5 years. The agreement contained no provision for payment of royalties for DHLI's use of the trademark.

### C. Sale of DHLI/MNV[1] and the "DHL" Trademark

From late 1986 to early 1988, DHL and DHLI negotiated with United Parcel Service ("UPS") concerning merger possibilities, but these negotiations broke down over price. UPS expressed little or no interest in the "DHL" trademark during these negotiations.

On December 21, 1988, Japan Airlines Co., Ltd. ("JAL") and Nissho Iwai Corp. ("NI") made an offer to purchase up to 80% of the combined DHL network. This offer was not well received, in part because Hillblom, a leading shareholder of both DHL and DHLI, did not want to give up his entire interest in DHL. A second offer was made on June 14, 1989. JAL and NI offered to purchase 60% of DHLI/MNV based on a total value for those companies of $450 million, and to purchase the trademark for $50 million. DHL counter-offered with a $100 million price for the trademark and a $500 million price for DHLI/MNV. However, in December 1989, the parties reached a memorandum of understanding for the sale based on the $450 million value for DHLI/MNV and the $50 million price, "subject to confirmation of the tax effect," for the trademark.

During the course of the negotiations, different parties provided a number of valuations of the DHL network and the "DHL" trademark. In February 1989, Robert Fleming Co. valued DHLI/MNV in a range of $392.2 to $680.4 million, and found that the "DHL" name, while intangible, was of some value that should be reflected in the final price. Peers and Co. produced a report on June 8, 1989, valuing DHLI/MNV at $522 to $580.9 million. In a revised report of September 14, 1989, it placed the value at $625 to $700 million.

---

**1.** Hereinafter, DHLI is sometimes used to refer to both DHLI and MNV collectively, as together they constitute the international component of the DHL network.

In June 1989, Nicholas Miller of Coopers & Lybrand valued the "DHL" trademark, outside the United States, at $25 million. This valuation was based in part on the view that DHL's trademark rights were diluted by its agreements with DHLI. On February 23, 1990, First Boston, retained by Lufthansa (JAL and NI's new partner), valued DHLI/MNV at $400 to $600 million and the trademark at $100 to $200 million. The First Boston trademark valuation, however, appears to have been done without knowledge of any ownership problems in the trademark.

On May 31, 1989, a Coopers & Lybrand report, commissioned by the foreign investors, raised the following concerns relevant to a possible purchase of DHLI/MNV: (1) DHL should receive an injection of capital via sale of the trademark; (2) DHL might be charged with imputed income based on prior uncharged royalties; and (3) DHL, in a trademark sale, should not have to pay royalties given its difficult financial position. DHL representatives also began to express concern about the tax consequences of the sale of the trademark, and they therefore sought a lower value for the trademark. As a result of these concerns, in July 1990, DHL sought a comfort letter from Bain & Co. on a $20 million trademark valuation. Bain supported the $20 million valuation after taking into account DHLI's possible ownership of the trademark and encumbrances in the form of royalty-free licenses to both DHLI (for the non-U.S. trademark interest) and DHL (for the U.S. trademark interest). On July 9, 1990, DHL and DHLI executed an agreement granting DHLI an option to purchase the "DHL" trademark for $20 million.

In late 1989, Lufthansa joined JAL and NI (collectively, the "Consortium"). On December 7, 1990, the Consortium and DHL/DHLI reached a final agreement under which the Consortium acquired (1) a 12.5% stock interest in DHLI/MNV, with an option to purchase an additional 45% interest based on a $450 million valuation of DHLI/MNV; (2) a 2.5% interest in DHL; and (3) an option to purchase the "DHL" trademark for $20 million, conditional upon the Consortium having first exercised its option to purchase the additional 45% interest.

The trademark option provided that DHL could use the "DHL" trademark in the United States royalty-free for 15 years. After 15 years, DHL would have the exclusive U.S. rights to the trademark for 10 years, but would have to pay a royalty fee of 0.75%. The final trademark purchase and sale agreement allocated the $20 million for the trademark in the following way: $17 million for the transfer of U.S. trademark rights, and $3 million for a quitclaim in the non-U.S. trademark rights. These two interests were to be transferred to separate entities.

The two-step acquisition process was designed to give the Consortium an opportunity to learn more about the DHL network prior to making a control commitment. During the interim period, the Consortium had the power to appoint 7 of the 13 directors of DHLI/MNV. The Consortium exercised this power, but the employees at the management level of DHLI/MNV remained the same. The Consortium did not exercise control over day-to-day management.

On June 7, 1992, the Consortium exercised its stock option, purchasing a majority stake in DHLI/MNV. The Consortium subsequently reorganized the entity into DHL International Ltd., incorporated in Bermuda. On September 17, 1992, the Consortium caused this new entity to exercise its option to purchase the "DHL" trademark rights for $20 million.

### D. The Commissioner's Deficiency Notice

The Commissioner's deficiency notice, issued June 30, 1995, listed deficiencies and penalties for the tax years 1990 1992. The initial deficiencies were based on a trademark valuation of approximately $600 million. The economist performing the valuation for the IRS was doing his first examination for the IRS; it was also his first effort at valuing a trademark. The total deficiency alleged in the notice was $194,534,167; the penalties in the notice totaled $74,777,222.

### E. The Tax Court's Decision

After an extended trial, the tax court upheld deficiencies and penalties totaling $59,427,093.[2] Although the amount of the deficiencies and penalties was much less than had been contained in the original notice of deficiency, the tax court held that the Commissioner had not abandoned his valuation. Accordingly, the tax court held that the burden of proof did not shift from the taxpayer.

The tax court accepted the Commissioner's contention that DHL and DHLI were commonly controlled until 1992. The tax court upheld an income allocation to DHL under 26 U.S.C. § 482 based on a $100 million valuation of the trademark. Of this $100 million figure, $50 million was for the domestic trademark rights and $50 million was for the overseas trademark rights.

In addition, the tax court upheld an allocation to DHL based on imputed income from uncharged royalties for DHLI's prior use of the "DHL" trademark. It also upheld an allocation based on imputed income from uncharged transfer fees between DHL and DHLI. The transfer fees represented amounts to compensate DHL for the excess of packages that it delivered on DHLI's behalf as against those that DHLI delivered on DHL's behalf.

The tax court's decision was entered on August 17, 1999. DHL timely appealed.

## II

■ Decisions of the tax court are reviewed on the same basis as decisions from civil bench trials in the district court. *Estate of Ashman v. Comm'r*, 231 F.3d 541, 542 (9th Cir.2000). Thus, we review the tax court's conclusions of law de novo and its factual findings for clear error. *Baizer v. Comm'r*, 204 F.3d 1231, 1233–34 (9th Cir.2000). We review the tax court's affirmance of a penalty for clear error. *Collins v. Comm'r*, 857 F.2d 1383, 1386 (9th Cir.1988).

■ "[T]he Commissioner has broad discretion under section 482, and neither we nor the Tax Court will countermand his decision unless the taxpayer shows it to be unreasonable, arbitrary or capricious." *Foster v. Comm'r*, 756 F.2d 1430, 1432 (9th Cir.1985) (citation omitted). Determinations with respect to valuation and common control are primarily factual determinations reviewed under the clearly erroneous standard. *Trust Servs. of Am., Inc. v. United States*, 885 F.2d 561, 568 (9th Cir.1989) (valuation); *B. Forman Co. v. Comm'r*, 453 F.2d 1144, 1155 (2d Cir. 1972) (common control).

■ However, interpretations of Treasury Regulations are reviewed de novo. *Dykstra v. Comm'r*, 260 F.3d 1181, 1182 (9th Cir.2001). Furthermore, de novo review applies where "the primary issue ... is whether the facts fall within the relevant legal definition." *Paccar, Inc. v. Comm'r*, 849 F.2d 393, 396 (9th Cir.1988). Determining whether DHLI qualifies as a "de-

---

**2.** The interest on this amount has increased DHL's liability considerably. On September 16, 1999, DHL paid the IRS $114,061,630, a figure that included $54,634,537 in interest.

veloper" or "assister" under the § 482 regulations (see *infra* Part V) constitutes such an inquiry.

### III

Section 482 gives the Commissioner authority to allocate income between two or more businesses "owned or controlled directly or indirectly by the same interests ... if he determines that such ... allocation is necessary in order to prevent evasion of taxes." 26 U.S.C. § 482. The purpose of § 482 is "to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer." Treas. Reg. § 1.482–1(b)(1) (1968). We first decide whether the tax court erred in finding sufficient common control between DHL and DHLI to justify application of § 482 to the sale of the "DHL" trademark rights.

#### A. Timing of the Analysis

■ We agree with the tax court that the relevant time period for determining whether common control existed for purposes of § 482, given the particular business context here, is the period of negotiation and completion of the trademark option agreement between DHL, DHLI, and the Consortium. That is, the endpoint for the period over which there needed to be common control within the meaning of § 482 was the completion of the binding option agreement. The economic reality of the transaction was that the price of the trademark was established at the time the Consortium obtained the option to buy it at the specified price. The ultimate purchase of the trademark at that price merely ratified the price that had been established at the earlier time. Because both parties concede there was common control between DHL and DHLI during all relevant times up to December 7, 1990, and because DHL and DHLI—largely without objection by the Consortium, *see infra* Part III.B—set the price term of the Consortium's option to purchase the "DHL" trademark in July 1990, we find that § 482 applies here. Thus, we need not determine whether there was sufficient common control for § 482 purposes at the time the trademark option was exercised.

This transactional approach for determining common control under § 482 comports with common sense, and the regulations, which state that "[i]t is the reality of the control which is decisive, not its form or the mode of its exercise." Treas. Reg. 1.482–1(a)(3) (1968); *accord Waterman S.S. Corp. v. Comm'r*, 430 F.2d 1185, 1192 (5th Cir.1970) ("[T]ax consequences must turn upon the economic substance of a transaction and not upon the time sequences or form of the transaction."), *overruled on other grounds*, *Utley v. Comm'r*, 906 F.2d 1033, 1037 n. 7 (5th Cir.1990).

The transactional analysis also finds support in *Rooney v. United States*, 305 F.2d 681 (9th Cir.1962). In that case the farmer-taxpayers raised a crop and made a contract for its sale. The taxpayers then created a corporation and transferred the crop to the new corporation. The taxpayers claimed a loss on their personal returns because they incurred the expenses of raising the crop but did not collect proceeds from its sale. The Commissioner sought to allocate the expenses of raising the crop to the corporation, but the taxpayer argued that the allocation was improper because the corporation did not exist at the time that the expenses were incurred. We affirmed the application of § 482 to this transaction, observing that § 482's "purpose is effected if the taxpayers are commonly controlled *when they deal with each other*; control at another time is unimportant." *Id.* at 683 (emphasis added). Applying *Rooney* to this case, we conclude that the time when the taxpayers (DHL and DHLI) were dealing

with each other was when they set the terms of the option agreement.

B. The Presence of the Consortium in the Negotiations

■ Because the price of the trademark was set at the time the option agreement was signed, the next question is who, in reality, set that price. DHL challenges the Commissioner's allocation of income by arguing that the presence of the Consortium on the other side of the negotiating table precludes a finding that income was shifted between DHL and DHLI. Unlike the usual case of two controlled taxpayers making a deal with each other, the deal in this case was made between two controlled taxpayers and an entity not controlled by the taxpayers. Nonetheless, we do not find the Consortium's presence sufficient ground to preclude a § 482 allocation, in light of the tax court's factual findings as to the Consortium's indifference to the specific trademark price term.

DHL cites *R.T. French Co. v. Comm'r*, 60 T.C. 836, 1973 WL 2530 (1973), in support of its argument that a third party's presence at the table ensures that a transaction is conducted at arm's length. In that case, the critical transfer consisted of royalty payments from R.T. French, a company jointly owned by two companies, to another company in which the joint owners had only a 51% interest. The tax court found that it was unlikely that there was any improper income shifting from R.T. French to the other company. Such shifting would have reduced the income of the joint owners of R.T. French, and enriched the 49% owners of the other company to the degree of that reduction. Because such shifting would have disadvantaged R.T. French and correspondingly advantaged the third-party 49% owners, the presence of the third parties ensured that the transaction was at arm's length.

■ This case is different from *R.T. French* because there is no such comparable advantage and disadvantage. Where a third party is indifferent to the terms of the transaction affecting the allocated items, its involvement does not interfere with the application of § 482. *See GAC Produce Co. v. Comm'r*, 77 T.C.M. (CCH) 1890, 1904 (1999). The one outside party in this case, the Consortium, would be neither advantaged or disadvantaged by the income-shifting between DHL and DHLI, as long as the total price it paid for DHLI and the trademark rights remained the same. On this view of the facts, the presence of the Consortium would not perform the same checking role that the presence of the third parties performed in *R.T. French*.

There was substantial evidence before the tax court supporting its conclusion that in the sale of DHLI and the trademark, the common owners of DHL/DHLI had considerable flexibility in structuring how the trademark price would be reflected in the deal terms. Without objection from the Consortium, the trademark price was reduced from $50 million in the initial agreement to $20 million in the final agreement. This reduction appears to have been based on considerations of DHL's potential tax liability and post-takeover viability rather than on the trademark's actual value. The trademark was initially priced at $50 million payable to DHL, "subject to confirmation of the tax effect." The price was then reduced to $20 million payable to DHL, with an accompanying addition to the agreement that DHL would be able to use the trademark royalty-free for the fifteen years following the sale to the Consortium, and to use it for a small royalty for ten years after that. If the value of the royalty-free and reduced royalty periods approximated the $30 million reduction in the sale price of the trade-

mark, this was essentially a wash from the standpoint of the Consortium.

Perhaps more important, the Consortium had an interest in ensuring that tax consequences of the sale did not reduce the economic viability of DHL. On this view of the facts, the Consortium was not indifferent to the tax consequences of the sale. Rather, the Consortium was advantaged by the income-shifting, and therefore had an interest in facilitating that shifting.

IV

Under Treasury Regulation § 1.482–2(d)(1)(i), where intangible property is transferred between commonly controlled entities, "the district director may make appropriate allocations to reflect arm's length consideration for such property or its use." The tax court found that $100 million ($50 million for the U.S. rights, $50 million for the foreign rights), rather than $20 million, was the arm's length value of the "DHL" trademark. We do not find the tax court's valuation, a factual determination, to be clearly erroneous;[3] thus we uphold the $100 million value.

■ DHL argues that the tax court's valuation is arbitrary and unreasonable and that the tax court failed to articulate its reasoning as required by *Leonard Pipeline Contractors Ltd. v. Comm'r*, 142 F.3d 1133 (9th Cir.1998). Under *Leonard Pipeline* the tax court is required

to spell out its reasoning and to do more than enumerate factors and leap to a figure intermediate between petitioner's and the Commissioner's.... A reasoned decision ... must bring together the disparate elements and give some account of how the judge has reached his conclusion.

*Id.* at 1135. The tax court has complied with this standard by giving a step-by-step account of its reasoning. First, following the Commissioner's approach, the tax court reached a $300 million value for all unbooked intangibles, measuring the equity value of DHL and DHLI's intangibles based on what the Consortium paid for the company in excess of its book value. Although not without problems,[4] this is a systematic, defensible approach. Second, the tax court determined that one-half of the total intangibles, or $150 million, was attributable specifically to the "DHL" trademark. The tax court, at several points, explained its belief that the trademark was worth at least as much as the other intangibles. Third, the tax court determined that two-thirds of the value of the trademark, or $100 million, was attributable to the non-U.S. rights to the trademark. Fourth, the tax court discounted the non-U.S. rights by 50% to reflect a marketability discount, based on potential problems with DHL's ownership of the foreign trademarks. The tax court therefore concluded that the foreign and domes-

---

3. Although the Commissioner's original $600 million valuation of the "DHL" trademark may have been "arbitrary and unreasonable," here we are reviewing the tax court's subsequent adjustment of that figure to $100 million, a factual finding owed substantial deference. *See Estate of O'Connell v. Comm'r*, 640 F.2d 249, 251–52 (9th Cir.1981) (explaining that the tax court has "broad discretion in determining what method of valuation most fairly represents the market value of the stock in issue").

4. DHL points out the following two problems. First, the approach was not used by any of the experts, all of whom measured the value of the trademark based on an "income" approach, where the value of the trademark is based on the present value of the trademark's future stream of income. Second, the book value of a company is often understated, so it may be misleading to assume that the value of the company in excess of its book value consists entirely of intangibles. Nonetheless, these shortcomings are debatable and certainly do not warrant reversal in this case.

tic trademarks were each worth $50 million, for a combined value of $100 million.

Although the tax court painted with a broad brush, that is to be expected given the imprecise art of valuing an intangible asset. DHL may dispute the exact figures used by the tax court in reaching its valuation, but DHL fails to demonstrate clear error, either in the tax court's methodology or in its final result. We therefore affirm the tax court's valuation of the trademark at $100 million, based on a $50 million figure for the domestic rights and a $50 million figure for the overseas rights.

V

■■■ Having affirmed the application of § 482 to the trademark sale and the $100 million valuation for the trademark, we must next ask whether the tax court properly allocated the full $100 million to DHL. DHL does not appeal the tax court's finding that it was the legal owner of both the domestic and foreign trademark rights. Rather, DHL asserts that the tax court erred in applying the § 482 developer-assister regulations, which preclude the allocation to DHL of the $50 million value of the foreign trademark rights.[5] We agree and reverse the tax court accordingly.[6]

The 1968 Treasury Regulations[7] for § 482 state

[W]here one member of a group of related entities undertakes the development of intangible property as a developer ... no allocation with respect to such development activity shall be made ... until such time as any property developed ... is sold, assigned, loaned or otherwise made available in any manner by the developer to a related entity in a transfer subject to the rules of this paragraph.

Treas. Reg. § 1.482–2(d)(1)(ii)(a). DHL contends that DHLI was the developer of the overseas trademarks. If this is true, DHL argues, the tax court's allocation for the foreign trademark value was erroneous under § 1.482–2(d)(1)(ii)(a) because the transfer in this case was not "*by* the developer *to* a related entity," but rather *from* a related entity (DHL) *to* the developer (DHLI).

Alternatively, should the court find DHL to be the developer, DHL argues that DHLI should be allowed a set-off under § 1.482–2(d)(1)(ii)(b) for the amount of assistance that it provided to DHL in developing the foreign trademarks:

Where one member of a group renders assistance in the form of loans, services, or the use of tangible or intangible property to a developer in connection with an attempt to develop intangible property ... the value of such assistance shall be

---

**5.** Because DHL's "developer" defense only applies to the overseas rights in the "DHL" trademark, we affirm the tax court's allocation to DHL of $50 million for the sale of the domestic trademark rights. Because the tax court's $50 million valuation fully captures the value of the domestic rights, we need not consider respondent's *Alstores* argument for imputing additional income to DHL for its 15 year royalty-free license to use the "DHL" trademark in the United States. *See Alstores Realty Corp. v. Comm'r*, 46 T.C. 363, 1966 WL 1162 (1966).

**6.** Because petitioner challenges the *legal* standards used by the tax court and Commission-

er in applying the § 482 regulations, rather than a factually erroneous application of the regulations, de novo review may be appropriate. Even under the more deferential standard advanced by respondents, we would find the tax court's legal interpretation and application of the developer-assister regulations unreasonable, as discussed below.

**7.** The 1968 regulations were the governing regulations during the tax years at issue (1990–1992) and, as the tax court correctly observed, apply in this case. Superceding regulations were adopted in 1994.

allowed as a set-off against any allocation that the district director may make under this paragraph as a result of the transfer of the intangible property to the entity rendering the assistance.

*Id.* § 1.482–2(d)(1)(ii)(b). DHLI would be entitled to the setoff because the transfer under this scenario was from DHL (developer) to DHLI (assister).

Under the 1968 regulations governing this case, the tax court's determination of whether an entity is a developer or an assister in the development of an intangible asset requires a case-by-case approach:

The determination as to which member of a group of related entities is the developer and which members of the group are rendering assistance to the developer in connection with its development activities shall be based on all the facts and circumstances of the individual case. Of all the facts and circumstances to be taken into account in making this determination, the greatest weight shall be given to the relative amounts of all the direct and indirect costs of development and the corresponding risks of development borne by the various members of the group.... Other factors that may be relevant in determining which member of the group is the developer include the location of the development activity, the capabilities of the various members to carry on the project independently, and the degree of control over the project exercised by the various members.

*Id.* § 1.482–2(d)(1)(ii)(c).

The tax court found that DHLI was neither a developer nor an assister. However, we hold that the tax court applied the wrong legal tests under the developer-as-sister regulations in reaching its conclusions.

A. Legal Ownership / Licensor–Licensee Standard

For the tax court, the fact that in its view DHL was the legal owner of the "worldwide"[8] trademark rights was decisive, in spite of the unusual circumstances of the licensing arrangement. The tax court stated, "[t]he related parties' relationship regarding the use of the DHL trademark was not a textbook example of a licensing agreement, but it was sufficient to bind these related parties and to effectuate control over the use of the trademark." Based on its resolution of the ownership question, the court then required DHL to demonstrate that DHLI's expenditures as either a developer or assister were more than the promotional expenses that a similarly situated licensee would expend at arm's length.

There are two problems with the tax court's approach. First, the tax court's ownership analysis and licensee-expenditure tests are in conflict with the plain language of the governing 1968 regulation, which lists four factors that the tax court should consider: (1) the relative costs and risks borne by each controlled entity; (2) the location of the development activity; (3) the capabilities of members to conduct the activity independently; and (4) the degree of control exercised by each entity. Treas. Reg. § 1.482–2(d)(1)(ii)(c). On a plain reading of the regulation, the principal focus appears to be not on legal ownership, but on equitable ownership based on economic expenditure. Legal ownership is not even listed among the factors.

---

**8.** Strictly speaking, there is no such thing as a single worldwide trademark: a company must register and maintain a trademark in each separate country. *See* 4 J. Thomas McCarthy, *McCarthy on Trademarks and Un-* *fair Competition* § 29:1 (4th ed. 2001) ("[A] trademark is recognized as having a separate existence in each sovereign territory in which it is registered or legally recognized as a mark.").

Additional evidence that legal ownership is not the proper test under the 1968 regulations comes from the process of drafting the superceding 1994 regulations. The 1994 regulations appear designed to correct for the fact that the old regulations ignored legal ownership in favor of an economic approach. The critical language from the preamble to the 1994 regulations is as follows:

> The 1993 regulations provided that ... intangible property generally would be treated as owned by the controlled taxpayer that bore the greatest share of the costs of development. This rule was criticized by many commenters, principally *because it disregarded legal ownership* .... For instance, a controlled taxpayer that was treated as the owner of an intangible for section 482 purposes might not be the legal owner. At arm's length, the legal owner could transfer the rights to the intangible to another person irrespective of the developer's contribution to the development of the intangible.

Intercompany Transfer Pricing Regulations Under Section 482, 59 Fed.Reg. 34,-971, 34,984 (July 8, 1994) (emphasis added).

Although the preamble refers to the 1993 temporary regulations rather than the 1968 regulations, the relevant provisions in the 1993 temporary regulations were the same as those in the 1968 regulations. The 1994 regulations are completely different from both the 1968 and 1993 proposed regulations, explicitly stating that legal ownership is the test for identifying the intangible. *See* Treas. Reg. § 1.482–4(f)(3)(ii)(A) (1994) ("The legal owner of a right to exploit an intangible ordinarily will be considered the owner for purposes of this section."). The 1994 revision of the 1968 regulations thus strongly reinforces a plain-meaning reading of the 1968 regulations, with the result that legal ownership is not the analytical touchstone for those regulations.

Second, the tax court erroneously required DHL to demonstrate that DHLI's expenditures as either a developer or assister were more than the promotional expenses that a similarly situated licensee would expend at arm's length. The tax court appears to have found this requirement in the 1994 regulations. *See id.* § 1.482–4(f)(3)(iii) ("Assistance does not, however, include expenditures of a routine nature that an unrelated party dealing at arm's length would be expected to incur under circumstances similar to those of the controlled taxpayer."). However, the applicable 1968 regulations impose no such burden and simply turn on the relative amounts spent and risks borne by the related entities in developing the intangible.

Even if "arm's length" licensee expenditures were the correct standard, it does not fit the facts of the present case. Such a standard may work where there is a clear line between development and exploitation. For example, the development of a drug (the basic fact-pattern employed in the examples for the 1968 regulations) can be distinguished from the marketing of that drug. Or, even in the trademark context, if a company with a product already recognized in the target market incorporated a local subsidiary, the subsidiary's expenditures might be presumed to be exploiting this trademark rather than developing its value.

The tax court treated this case as one in which a well-established product or service is licensed to a licensee. This is a mistake, however, because the value of the DHL trademark was created only by virtue of the sustained and combined efforts of both DHL and DHLI. Although DHL began with domestic delivery, the ultimate value of the DHL trademark was dependent on demonstrating the company's ability to deliver internationally. DHLI was formed

shortly after DHL began operations. The only entity that moved packages out of the United States, and between all foreign points, was DHLI. DHLI therefore both developed the trademark in foreign countries and developed the service network that was the foundation for the trademark. Given the growth and profitability of DHL's international operations, the history looks much more like an equal partnership than a subsidiary incurring advertising expenses to exploit the trademark of a parent company.

### B. Four Factors under the 1968 Regulation

The tax court failed to apply the relevant factors mandated by the 1968 regulation for determining who is a developer or assister. First and foremost, the regulation provided that "greatest weight shall be given to the relative amounts of all the direct and indirect costs of development and the corresponding risks of development borne by the various members of the group." Treas. Reg. § 1.482–2(d)(1)(ii)(c). Here, the relevant intangible is the foreign trademark rights. Trademark rights are created by registration and/or use in a given country and have a separate legal existence under each country's laws. *See* 4 McCarthy, *supra,* § 29:1.— Trademark rights are further developed and strengthened by advertising and promotional activities. *Nestle Holdings, Inc. v. Comm'r,* 70 T.C.M. (CCH) 682, 716–17 (1995), *rev'd on other grounds,* 152 F.3d 83 (2d Cir.1998).

DHLI undertook the registration of the "DHL" trademark in numerous foreign countries and bore essentially all related costs. Furthermore, DHLI paid for all of the overseas marketing campaigns with the "DHL" trademark, an expense that exceeded $340 million. Since developing a trademark includes advertising that mark, it does not make sense to distinguish between typical marketing activity and development.[9] *See* Marc M. Levey, *Tax Court Sends Messages to Taxpayers in* DHL, 482 PLI/Tax 775, 786 (2000) ("For trademarks connoting brand image, which is highly company and market specific, this test may be an impossible benchmark to quantify."). In addition, DHLI bore the costs of protecting the foreign trademarks against infringement and handled all disputes relating to trademark usage abroad. Conversely, it was undisputed at trial that DHL bore none of the costs and risks in developing the foreign trademark rights. Thus, the first and most important factor clearly favors DHLI as the developer of the foreign trademark rights.

The other three factors, less important but nonetheless relevant, further support DHLI's status as the developer. The location of the development activity was in the foreign countries which DHLI, not DHL, served. DHLI was better suited to carry on the advertising and marketing independently given its connections to the foreign countries. Finally, DHLI exercised greater, if not exclusive, control over the advertising and development of the foreign trademarks.

Even if we accepted the tax court's conclusion that DHL was the developer, DHLI would at least qualify as an assister under the aforementioned regulations. The tax court therefore clearly

---

9. The tax court, in finding that DHL did not meet its burden of proof, relied in part on what it deemed a "paradox" in DHLI's claim that $340 million was spent on development of a trademark worth, in DHLI's view, only $20 million. However, the $20 million figure represented the sale of DHL's rights in the "DHL" trademark, not the total value of the foreign trademark rights, which may have a considerably greater value. Moreover, a trademark requires ongoing development activity. Advertising is ephemeral, and trademarks require continued promotion. *See Nestle Holdings,* 70 T.C.M. (CCH) at 716–17.

erred in saying that the Commissioner may not be compelled to set off the value of the assistance against any allocation. The 1968 regulation provides that "the value of the assistance *shall* be allowed as a set-off against any allocation." Treas. Reg. § 1.482–2(d)(1)(ii)(b) (emphasis added). Thus, the set-off is mandatory. Moreover, the petitioner need not show the precise amount of its development expenditures here, since presumably at least $50 million (the amount the tax court allocated to DHL for the foreign trademark rights) of the $340 million spent by DHLI in overseas advertising constitute development expenditures for the "DHL" trademark.

In summary, we hold that DHLI was the developer of the international trademark, in which case no allocation to DHL for the value of the foreign trademark rights was appropriate, or, alternatively, that DHLI provided assistance to DHL's development, thereby entitling DHL to a complete setoff against the $50 million allocation.

### VI

■ The tax court upheld deficiencies based on allocated imputed income for the tax years 1990–1992 from uncharged royalties.[10] The royalties were those the tax court held that DHL should have charged to DHLI for use of the "DHL" trademark from 1982 through 1992.[11] Applying the same developer-assister regulations as in Part V, *supra,* we reverse the allocation of unpaid royalties to DHL.[12]

■ The concept of the developer-assister regulations is that the party that incurred the costs and risks of developing the intangible should not be required to pay a royalty to use that intangible. Levey, *supra,* at 786; James P. Fuller, *Jim Fuller's U.S. Tax Review,* 18 Tax Notes Int'l 391 (1999). As we held in Part V, DHLI was the developer of the overseas component of the "DHL" trademark, and thus no royalty income should be allocated to DHL for DHLI's use of those rights. Since the trademark license was *from* a related entity (DHL) *to* the developer (DHLI) rather than a transfer by the developer, no allocation is permitted under § 1.482–2(d)(1)(ii)(a).[13]

### VII

The tax court upheld two types of penalties under 26 U.S.C. § 6662 against peti-

---

10. DHL does not appear to appeal the allocation of the unpaid transfer fee payments, which were assigned to cover the difference between the extra packages that DHL delivered for DHLI as against those that DHLI delivered for DHL. Neither the petitioner's opening nor its reply brief addresses the unpaid transfer fees; thus, any challenge is deemed waived. *See Kim v. Kang,* 154 F.3d 996, 1000 (9th Cir.1998) ("[W]e will not ordinarily consider matters on appeal that are not specifically and distinctly argued in appellant's opening brief.") (citation and internal quotation marks omitted).

11. Uncharged royalties for years prior to 1990 were relevant because of their impact on net operating losses that DHL sought to carry forward to the years in question.

12. Because we decide that the developer-assister regulations preclude any allocation to DHL assuming § 482 applies, we need not address DHL's argument that § 482 is inapplicable because DHL and DHLI lacked common control from 1990–1992. Nor do we need to decide whether evidence that DHLI entered into similar royalty-free licensing agreements with local operating agents establishes that there was arm's length consideration between DHL and DHLI under § 1.482–2(d)(2)(ii).

13. Again, had we deemed DHL the developer of the overseas trademark rights, assessing additional taxes from imputed royalty income would still be inappropriate because DHL would be entitled to set off the assistance DHLI provided in promoting the mark against the royalty allocation.

tioner: (1) a substantial understatement penalty for the unpaid royalties, and (2) a gross valuation misstatement penalty on the additional $80 million that the tax court allocated to DHL for the sale of the "DHL" trademark to DHLI. Because we reverse the allocation of imputed income from the unpaid royalties in Part VI, we reverse the first penalty in its entirety without further discussion.

■ As to the second penalty, we turn to the statute. Substantial valuation misstatements, which incur a 20% penalty on underpaid tax, include determinations under § 482 where the reported price is 50% or less of the arm's length price. *See* 26 U.S.C. § 6662(e)(1)(B) (1994). Gross valuation misstatements, which incur a 40% penalty on underpaid tax, include determinations under § 482 where the reported price is 25% or less of the arm's length price. *See id.* § 6662(h). If a § 6662 penalty is assessed, the question of which penalty (substantial or gross) applies is purely a question of computation.

No valuation misstatement penalty is warranted, however, if "there was a reasonable cause" for the underpayment and "the taxpayer acted in good faith" with respect to the underpayment. *Id.* § 6664(c). The key issue before the tax court was whether DHL showed good faith by obtaining a comfort letter from Bain & Co. regarding the $20 million valuation for the "DHL" trademark, or whether the comfort letter was an instrument in DHL's allegedly evasive scheme. The tax court rejected Bain's appraisal as a basis for demonstrating goodfaith reliance on an expert. The tax court stated that it was not reasonable for DHL to have relied on the comfort letter because DHL sought the letter only after choosing an artificially depressed price, which it then communicated to Bain. The tax court observed that "parties can find experts who will advance and support values that favor the position of the person or entity that hired them."

We are less inclined than the tax court to condemn a taxpayer who seeks a comfort letter from a respected financial firm in order to ensure compliance with IRS standards. There is no evidence that DHL manipulated Bain's appraisal or that Bain blindly affirmed DHL's desired figure. Indeed, the $17 million valuation of the domestic trademark rights which Bain supported was much closer to the tax court's valuation of $50 million than the IRS's own original valuation of over $350 million for the domestic rights. Accordingly, the tax court clearly erred in rejecting DHL's reliance on the Bain comfort letter as an indication of DHL's good faith, and we reverse its penalty assessment under § 6662.[14]

**Conclusion**

For the foregoing reasons, we AFFIRM in part and REVERSE in part, and RE-

---

**14.** The German Ministry of Finance submitted an amicus brief contending that the tax court's decision violated Article 9 of the Convention and Protocol Between the United States of America and Federal Republic of Germany for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital and to Certain Other Taxes, S. Treaty Doc. No. 101–10 (Aug. 29, 1989). However, because Article 9 "incorporates into the Convention the general principles of section 482 of the Code," it raises no new substantive legal issues. Treasury Dept., *Technical Explanation of Tax Convention and Protocol with Germany*, 90 Tax Notes Int'l 25–73 (1990). Thus, our analysis remains the same. The amicus also claims that the tax court violated Article 24, which prohibits discrimination against a German taxpayer. Because the discrimination claim is based on the assertion that the tax court did not properly follow legal authority, this opinion already addresses the relevant concerns.

MAND for further proceedings consistent with this opinion.